GEORGE W. EASON, TRUSTEE, v. J. E. DELONG ET AL.

Decided March 22, 1905.

**1.—Chattel Mortgage—Reservation of Title—Parol Sale.**

The effect of the statute making a sale of personal property on time with a reservation of title in the seller a chattel mortgage which shall be void as to creditors and innocent purchasers unless in writing and properly registered, is to render the transaction a chattel mortgage as well between the vendor and vendee as to all others, and whether the sale and reservation be by parol or in writing. Rev. Stats., art. 3327.

**2.—Same—Sale—Bailment.**

Where the property is delivered on an agreement that the title is not to pass until the consideration is paid, the statute makes the transaction a sale, and it is not a case of bailment with title remaining in the owner.

Appeal from the District Court of Anderson. Tried below before Hon. John J. Word.

*Gregg, Brown & Brooks,* for appellant.—The court erred in not rendering judgment against intervener, Lee Smith, foreclosing the mortgage on the engine and boiler, because the testimony, taken the strongest possible against plaintiff and in favor of Lee Smith, showed at most a verbal sale and attempt to retain ownership and title to the engine and boiler to secure the payment of the purchase money, which character of transaction under our statutes, where put in writing, is a chattel mortgage, but where it is verbal it is simply a sale. Rev. Stats., art. 3327; Harling v. Creech, 88 Texas, 300; Hoyt & Bro. Co. v. Weiss, 32 S. W. Rep., 86; Tufts v. Cleveland, 3 S. W. Rep., 288; Lazarus v. Henrietta Bank,

72 Texas, 354; Harrold v. Barwise, 30 S. W. Rep. 499; Hastings v. Kellogg, 36 S. W. Rep., 822.

*E. P. Miller* and *Gooch & Springer,* for appellees.—The delivery of personal property, where no consideration is paid therefor, with the understanding and agreement that no title is to pass until the same is paid for, does not constitute a sale; and the person to whom such delivery is made is at most but a bailee, and the title and right to possession remain in the owner of the property. Farmers' Nat. Bank v. Henderson, 29 S. W. Rep., 562; Machine Co. v. Brown, 82 Texas, 469; Joseph v. Cannon, 11 Texas Civ. App., 295.

FLY, ASSOCIATE JUSTICE.—This is a suit instituted by appellant, as trustee in bankruptcy of the estates of W. P. Devereux and Homer Garrison, and the firm of Devereux & Garrison, for the purpose of collecting certain notes given by DeLong, and to foreclose mortgages on a certain boiler and engine, among other personal property. Will Perkins, W. L. Newsom, J. W. Shipman and the First National Bank of Athens were made parties on the ground that they were setting up a claim to or lien on the property. DeLong answered by general demurrer and general denial. The other defendants did not answer so far as disclosed by the record. L. W. Smith filed a plea in intervention, alleging that the boiler and engine belonged to him, and that on or about February, 1903, intervener delivered the engine and boiler to the Frankston Lumber Company, a firm then composed of W. P. Devereux, Homer Garrison and J. E. DeLong, to be used and operated by him; that the title to the property was not to pass, but was to remain in intervener until the sum of $300 was paid. It is not alleged that the amount was not paid. The cause was tried by the court and judgment rendered that appellant recover from DeLong the sum of $6,466.62, and that the mortgages be foreclosed on all the property except the engine and boiler; that Perkins recover of DeLong $420.55; that Shipman recover of DeLong the sum of $193.55; that the First National Bank of Athens recover of him the sum of $1,813.37; that Newsom take nothing by his suit, and that L. W. Smith recover the boiler and engine. This appeal is prosecuted by the trustee in bankruptcy, and while it does not appear in the record upon what pleadings or evidence the judgments in favor of the other defendants were rendered, no one has complained of the judgments, and this court will concern itself with nothing but the issues between appellant and the intervener. The evidence showed that DeLong had given a valid mortgage on the engine and boiler to the parties whose estate was represented by appellant.

The judgment of the court must rest upon the testimony of L. W. Smith and his wife, and if that evidence is sufficient to sustain the judgment, it must be affirmed, regardless of the antagonistic evidence of DeLong and others. Mrs. Smith testified as follows: "I am the wife of Lee Smith, and I remember Mr. DeLong and my husband coming to my house sometime in February, 1903. They were on trade for an engine and boiler that my husband owned. When they got to the house it was way after dinner time, about three o'clock,

but I fixed dinner for them, and while they were eating dinner my husband stated that he had sold Mr. DeLong the engine and boiler for $300 worth of lumber and shingles; that the lumber and shingles were to be cut and sawed just as soon as the mill got in operation, and delivered as quickly as possible with the express understanding that the title to the engine and boiler was to remain in my husband until they were fully paid for."

L. W. Smith swore: "Sometime in February, 1903, about the middle of the month DeLong told me he wanted to start up another saw mill and needed an engine and boiler. I told him I had a boiler and engine that I would sell for $300 in cash. He said he had no money to buy with, but that as I was going to build more houses, I would need lumber and shingles, and if the engine and boiler were suitable for his purposes he would deliver me $300 worth of lumber and shingles for them as soon as he could get the mill up and in running order to cut and saw the lumber and shingles. I told him I would let him have the boiler and engine on those terms. We then went over to where the boiler and engine were and he examined them and said they would suit him, and he would take them. I told him he could take them and put his mill to running at once, but the engine and boiler were mine, and were to remain my property until he delivered me the $300 worth of lumber, which was to be the first lumber and shingles cut and sawed after the mill was put in operation. We then went back to my home, it being about three o'clock p. m., and my wife fixed dinner for us, and while at the table eating I told my wife about the trade in DeLong's presence. I would not have sold DeLong anything on credit or trusted him for payment for anything on time, for the reason I had prior dealing with him and had lost confidence in him. I had contracted with him to build me a house which he failed and refused to finish and complete, and I had to employ another party to finish and complete. And I had sold him a horse on credit which he failed to pay for, and which he refused to turn back to me, and which he now has. While discussing the trade for the engine and boiler DeLong proposed executing a note or written obligation to pay the $300 worth of lumber, but I told him there was no note or writing required in the matter; he could take the engine and boiler and start his mill to running and cut and saw the lumber and shingles, and as soon as he delivered the lumber and shingles to me within the next three or four months he would then own the boiler and engine, but until he did so they were my property. The lumber and shingles were to be delivered to me just as soon as it could be cut and sawed after the mill was put up and in operation, within a few months. Sometime afterward in the month of March, between first and middle of the month, I think, DeLong came with wagons and teams and removed the boiler and engine to the place where the mill was to be located on the railroad. At this time he asked me about the kinds of lumber I wanted, and I told him; he said that the lumber and shingles would have to be shipped in carload lots, and that in loading he might have to put on something over the amount of lumber he was to deliver to me, to make up full carloads, in which event it was agreed that I should

pay him for such overplus of lumber. I then made arrangements to build two houses at another station on the railroad, and a sufficient time having elapsed for the delivery of the lumber and shingles, and no delivery made, I wrote to DeLong telling him I needed the stuff for my buildings, and to hurry its delivery. He wrote in reply that some delay had occurred, but my lumber was sawed and would be shipped at once. Not receiving any lumber and shingles, I wrote again, to which he answered he had been disappointed in getting the lumber and shingles shipped to the place I intended building the houses, but he would get it shipped at an early day. I then went to Frankston to see him about the matter, and get lumber elsewhere, if he would not deliver it. Upon my arrival at Frankston I saw Mr. Joe Gordon and asked for DeLong; he said DeLong was in town, and pointed him out on the other side of street. I do not recollect of telling him that I had sold DeLong a boiler and engine and he had failed to pay for them, if I did I never went into the details and particulars of the trade.

I went over to where DeLong was, and told him he had failed to comply with his agreement about the engine and boiler, and that he must deliver me the lumber and shingles or pay me $300 at once, or deliver to me the boiler and engine. He said his business affairs and matters were now so tied up he could do nothing himself, but that I would get my engine and boiler back and lose nothing. I then went to McKee's mill and bought a carload of lumber. I told McKee I had traded DeLong an engine and boiler for lumber, but he had disappointed me, and I had to have lumber at once for buildings I was erecting. I did not explain to McKee the particulars of the trade made between myself and DeLong. I had heard that DeLong, Devereux and Garrison constituted the Frankston Lumber Company. When DeLong came after the engine and boiler he said they were for the lumber company. Yes, I sold, leased and rented or traded, or whatever it may be called by, the engine and boiler to DeLong on the terms and conditions I have stated."

It is provided in article 3327, Sayles Statutes, that, "all reservations of the title to or property in chattels as security for the purchase money thereof, shall be held to be chattle mortgages, and shall, when possession is delivered to the vendee, be void as to creditors and *bona fide* purchasers unless such reservations be in writing and registered as required of chattel mortgages." The effect of that article is to declare that when property is sold to another and the title to it is reserved by the vendor until the purchase money is paid, the transaction creates a chattel mortgage, as well between the vendor and vendee as to all others. This declaration seems to apply to all reservations of the title to or property in chattels as security for the purchase money, whether the reservation be by parol or in writing. This, we think, is apparent from the provision that the chattel mortgage, in case possession is delivered to the purchaser, shall be void as to creditors and *bona fide* purchasers unless the reservations are in writing and properly registered. There would be no reason for the provision as to the reservation being in writing if a parol mortgage was invalid as between the parties. It may be, as seems to be held

in the case of Gay v. Hardeman, 31 Texas, 245, that prior to the enactment of article 3327 a parol reservation in the sale of personal property would not create a mortgage, but the statute has declared a different rule, and such reservation would be a chattel mortgage whether it is made by parol or in writing. As held by the Supreme Court, in the case of Harling v. Creech, 88 Texas, 300, the statute in question was passed not only for the protection of creditors and innocent purchasers, but for the protection of vendees from the power of the vendor to reclaim the property, and thus destroy the vendee's equity of redemption, as well as the right to any surplus over the debt, in case of sale of the property. That object of the law would not be attained if parol reservations of title did not become mortgages merely by failing to put the reservation in writing. There is nothing in Lazarus v. Bank, 72 Texas, 354, pertinent to the facts therein detailed, that is in conflict with our view of the law. It is true that there are expressions in that opinion that might be so construed, but the facts did not call for such expressions, and they can not be considered as authority. In the cases of Harrold v. Barwise, 10 Texas, Civ. App., 138, 30 S. W. Rep., 498, and in Hastings v. Kellogg, 36 S. W. Rep., 821, there may be like expressions, but the court was not considering the question as to the mortgage being a chattel mortgage as between the parties, but was looking at its effect on third parties. They are authority, at least, for holding that the transaction in this case could not affect the validity of the mortgage given to appellant by DeLong.

It is the contention of appellee Smith that the facts show that the engine and boiler were merely placed in the hands of DeLong to be used by him; that no debt was created in favor of Smith, and that therefore there was no sale with a reservation of title to secure purchase money of the property. Mrs. Smith swore that her husband stated, "that he had sold Mr. DeLong the engine and boiler for $300 worth of lumber and shingles; that the lumber and shingles were to be cut and sawed just as soon as the mill got in operation, and delivered as quickly as possible, with the express understanding that the title to the engine and boiler was to remain in my husband until they were fully paid for." Smith swore: "I told him I had an engine and boiler that I would sell for $300 in cash. He said he had no money to buy with, but that as I was going to build more houses, I would need lumber and shingles, and if the engine and boiler were suitable for his purposes he would deliver me $300 worth of lumber and shingles for them, as soon as he could get the mill up and in running order to cut and saw the lumber and shingles. I told him I would let him have the boiler and engine on those terms." He swore to the reservation of title to the property, and that he afterwards attempted to get the lumber and shingles or to collect $300 in cash. He further said: "I told McKee I had traded DeLong an engine and boiler for lumber, but he had disappointed me, and I had to have lumber at once for buildings I was erecting." We think the facts bring the case clearly within the purview of article 3327.

The proposition is advanced by appellee Smith that when the consideration is not paid, delivery of personal property with the under-

standing and agreement that no title is to pass until the consideration is paid does not constitute a sale, and the person to whom the property is delivered is only a bailee, and the title and right to possession remain in the owner of the property. The proposition is directly in the teeth of the statute above cited. The following authorities are cited to sustain the proposition: National Bank v. Henderson (Texas Civ. App.), 29 S. W. Rep., 562; Machine Co. v. Brown, 82 Texas, 469; Joseph v. Cannon, 11 Texas Civ App., 295. We think a review of those cases will show that they do not sustain the foregoing proposition.

In the case of Bank v. Henderson, the cattle were sold for cash and there was no actual delivery of the cattle. It is true that they were put in a pasture belonging to the parties to whom it was alleged they belonged, but under an express understanding that there was no sale until the cash was paid, and the owners of the cattle had other cattle in the pasture at the time. The court held that "no title with or without reservation" passed to the owners of the pasture. The court cited the case of Long v. Rickmers, 70 Texas, 110, in which similar facts prevailed. There was absolutely no sale, and consequently could be no reservation of title to secure the purchase money.

In the case of Machine Co. v. Brown, the former had sold machinery to a lumber company for a cash consideration of $200, and two notes for $300 each, subject to a trial of the machinery by the purchaser. The machinery was sent, but the purchaser refused to test it or to make the cash payment. The court held that there was no sale, and consequently there could be no reservation of title to secure the purchase money. In the case of Joseph v. Cannon the sale was for cash, and although the goods were sent to the intending purchaser, it was held that there was no sale until the cash was paid.

In this case the sale was on time, with a reservation of title to secure the purchase money. The statute declares that such a transaction is a chattel mortgage, and void as to creditors or innocent purchasers unless it is in writing and properly registered.

The judgment will be affirmed, except as to that part of it relating to the engine and boiler, but as to that portion it is reversed and judgment here rendered that L. W. Smith take nothing by his intervention and pay all costs incurred through his intervention in this and the lower court, and that the mortgage lien of appellant be foreclosed on the engine and boiler.

*Affirmed in part. Reversed and rendered in part.*