## CITY OF SAN ANTONIO v. CHAS. M. STIEFF, Inc.

### No. 9437.

Court of Civil Appeals of Texas.
San Antonio.

March 27, 1935.

Rehearing Denied May 22, 1935.

Al. J. Klein and T. D. Cobbs, both of San Antonio, for appellant.

Wm. Aubrey, of San Antonio, for appellee.

MURRAY, Justice.

Appellee, Chas. M. Stieff, Inc., a Maryland corporation, as plaintiff, instituted this suit against appellant, city of San Antonio, as defendant, seeking to recover the sum of $1,300, together with interest, representing the purchase price of a certain piano delivered to, the city of San Antonio by Walthall Music Company, a Texas corporation. Appellee's petition also contained a count seeking in the alternative to recover the reasonable market value of this piano.

The facts are as follows: The Walthall Music Company had been in the retail music business in the city of San Antonio for a number of years. Chas. M. Stieff,

Inc., was engaged in the wholesale piano business. These two corporations, on March 4, 1929, entered into a contract or agreement, in the form of a letter written by a representative of Stieff, Inc., to Walthall Music Company and accepted by Leon N. Walthall, as president of the Walthall Music Company. This agreement is as follows:

"(Letterhead of Walthall Music Company.)

"San Antonio, Texas, March 4; 1929.

"Walthall Music Company, San Antonio, Texas

"Dear Sirs: We will ship in accordance with your order, the following instruments:

| | |
|---|---|
| #185 Stieff Petit—Figured Mahogany, dull | 670.00 |
| # 66 Davis & Son, Mahogany dull | 180.00 |
| # 60 Bennett-Bretz, Mahogany | 340.00 |

—on consignment for four months. It is understood that Walthall Music Company is to pay the freight from Baltimore and to carry the insurance at our wholesale prices as above quoted. If the instruments shipped under this agreement are paid for within thirty (30) days from date of shipment, a cash discount of three per cent (3%) will be allowed from billing prices.

"Should these instruments not be sold at the expiration of four months, and should we order them returned at that time, or at any future time, Walthall Music Company agrees to pay the freight and for any unreasonable wear and tear.

"Monthly stock reports will be sent Chas. M. Stieff, Inc. showing location of all unsold consigned pianos.

"Should the instruments remain, by mutual consent, above the term of four months it is understood that Walthall Music Company is to pay Chas. M. Stieff, Inc. interest at the rate of six per cent (6%) per annum. In the event the instruments are sold, the firm of Chas. M. Stieff, Inc. will receive from Walthall Music Company cash settlement in full plus the interest charge, if any.

"It is agreed that should Walthall Music Company sell an instrument consigned to them by Chas. M. Stieff, Inc. on time or on installments, Walthall Music Company may as agents of Chas. M. Stieff, Inc., sell to a finance Company such contract resulting from such sale, with recourse on the Walthall Music Company but not on Chas. M. Stieff, Inc., for a sufficient amount to enable the Walthall Music Company to settle with Chas. M. Stieff, Inc., for the instrument involved. Said settlement to be made by Walthall Music Company to Chas. M. Stieff, Inc. immediately after proceeds from sale of such contracts are returned by Walthall Music Company.

"Such additional shipments as may be agreed upon will be made on the same basis and at the then prevailing prices. Your acknowledgment and acceptance of the foregoing will constitute the contract.

"Very truly yours,
"Chas. M. Stieff, Inc.,
"Per [Signed] Frederick Phillip Stieff, Vice Pres.

"Accepted and agreed to
"Walthall Music Co.
"By: Leon N. Walthall."

Pursuant to this agreement, appellee, Stieff, Inc., shipped a number of pianos to Walthall Music Company. These pianos were sold by the Walthall Music Company to various customers and settlement made with appellee by Walthall Music Company executing its trade acceptances to appellee, and attaching thereto as collateral the notes and sale contracts of the various customers. This practice continued until the music company was indebted to appellee in the sum of more than $8,000.

On November 27, 1929, appellee wrote a letter to the music company in which it stated as follows: "On receipt of your letter of November 18th we wrote you, under date of November 23rd that we were willing to accept collateral from you. Such instruments as you may have bought between November 23rd and this date you may send us collateral if you so desire, but on future orders it will be necessary for us to revert back to our original understanding covered by our contract of March 4th, 1929. This understanding is to the effect that the pianos will be consigned to you for four months, after which time interest at the rate of six per cent will be charged. Immediately upon the sale of a piano you are to pay us in cash for such piano. What arrangement you have with other finance companies is of course of no concern of ours. This is the only basis on which we would be willing to sell."

On December 2, 1929, the music company wrote a letter to appellee in reply to its letter of November 27, in which reply the

music company made the following statement: "We note that it will be agreeable to accept collateral on goods shipped up to the 27th of November as per your letter of November 23rd, but for future shipments it is understood that the same will be in accord with the written contract of March fourth, i. e. on consignment for four months interest 6% after that time. When a sale is made we are to settle for the instrument in cash and will govern ourselves accordingly, although I am afraid this arrangement will curtail the volume that we could otherwise do on your lines."

On November 29, 1929, appellee sent the music company the following telegram: "Can ship five foot eight grand about one week provided you assure us that settlement will be made for cash when sold in accordance with provisions of contract of March fourth. Please wire."

On the same day the following reply was telegraphed by the music company: "Collateral aggregating thirty seven hundred sent you twenty sixth per your letter twenty third. stop. Sale five foot eight for use Municipal Little Theatre will be cash one. Please ship immediately."

The piano delivered to the city of San Antonio was a Stieff grand piano, bearing No. 43936, and was shipped by appellee to the music company on December 13, 1929, subject to the provisions of the agreement of March 4, 1929.

A committee of ladies appointed by the mayor of the city of San Antonio called at the place of business of Walthall Music Company and selected, for the city, the type of piano that was finally delivered to the city. However, the particular piano selected by the ladies was not delivered to the city, but another piano of the same make and style was, in fact, delivered. The piano was delivered by Walthall Music Company to the city of San Antonio in January, 1930, and, in due course, the city authorities approved the bill for the piano and ordered a warrant or voucher issued to the Walthall Music Company in the sum of $1,300. The city auditor declined to deliver the warrant to the music company for the reason that he had discovered that the Walthall Music Company was indebted to the city for past-due taxes in a sum far in excess of the price of the piano. Section 114 of the city charter prohibited his delivering a warrant under such circumstances. Mr. Walthall, as president of the music company, demanded payment in cash for the piano from the city authorities, but never, at any time, undertook to reclaim the piano. In February, 1930, the Walthall Music Company was adjudged a bankrupt, and ceased to be a going concern. The wholesale price of this piano was $720, and the difference between $720 and $1,300 represented the gross profit of the music company. After the music company was adjudged a bankrupt, appellee wrote the city demanding not only the payment of the $720, representing the wholesale price, but the entire $1,300. The city refused this demand, stating, in effect, that they had dealt with nobody but the Walthall Music Company, and that appellee was not known in any way in the transaction. Appellee then demanded the return of the piano, which was also refused. Approximately nine months later, in November, 1930, appellee instituted this suit against the city. The trial was to the court, without the intervention of a jury, and resulted in judgment for appellee against the city of San Antonio in the sum of $1,595.75. The city presented this appeal.

It is plain from the above statement of this case that the piano delivered to the city of San Antonio was shipped by appellee to the music company subject to the provisions of the agreement of March 4th, and, therefore, a proper disposition of this case requires a construction of that agreement.

It is contended by appellee that the agreement of March 4th should be construed as a contract between principal and factor, and that the interpretation of this contract should be governed by the customs and usages of factors and commission merchants. We cannot agree with this contention. One of the first essentials of a factoring contract is that the agent, or the factor, must be engaged in the business of factor, or commission merchant. 25 C. J. p. 342, § 4; R. C. L. 11, pp. 753, 754.

There is no contention that the Walthall Music Company was a factor, or commission merchant, but, on the contrary, the record affirmatively shows that it was a retail dealer in musical instruments.

Another reason why this is not a factoring contract is that under this contract the music company is at liberty to sell at any price, and receive payment at any time it likes, and is bound if it sells to pay

the consignor a fixed price. 25 C. J. p. 414, § 145.

The next question presented is whether or not this was a contract of bailment for the purpose of sale, whereby the Walthall Music Company became the agent of appellee for the purpose of selling appellee's pianos. We conclude that this is not a contract of bailment. It is sometimes very difficult to determine whether or not a particular contract is one of bailment for the purpose of sale, or one of conditional sale. In construing the contract here involved we must resort to the familiar rule that the intention of the parties is to govern, and that this intention is to be arrived at, not from any particular expression in the contract, but from the contract as a whole and the surrounding circumstances. The manner in which the contract was treated by the parties before any controversy arose is, as a rule, very helpful in arriving at the intention of the parties. In this case the wholesale dealer shipped pianos to the retail dealer to be placed among its stock of merchandise and daily exposed to sale. The music company sold these pianos to various customers, taking notes and sale contracts in its own name, then executing trade acceptances to appellee, and attaching these notes and sale contracts as collateral, and in this manner securing appellee for the wholesale price of the pianos. This method of selling would indicate that the music company was treating this contract as one of sale and not of bailment, and appellee's acceptance of these trade acceptances with the accompanying collateral confirms this construction.

One element lacking in this contract, which definitely determines that it was not a contract of bailment for the purpose of sale, is the failure of the contract to provide, either in express terms or by implication, that the proceeds of the sale of these pianos should belong to appellee. The contract does not provide that the title of the pianos shall remain in appellee. It does not attempt to control the manner in which these pianos may be sold, or at what price, or whether for cash or on time; it simply provides that when the pianos are sold Walthall Music Company shall be indebted to Stieff, Inc., for the invoice or billing price of the pianos. The music company covenants that it will pay this price in cash when a sale is made.

The lack of this element is made still plainer by the letter of November 27, 1929, in which Stieff, Inc., informs Walthall Music Company, in effect, that they are not concerned with how Walthall Music Company secures the money to pay the invoice price, but that when a piano is sold Stieff, Inc., expects the music company to remit to it in cash for the wholesale price of the piano.

In 55 C. J. p. 585, § 593, this principle of law is aptly stated in the following language: "Ordinarily where goods are consigned by one person to another for sale by the latter, the title thereto remains in the consignor; but whether the consignee is to be considered as a buyer or an agent depends on the intention of the parties, and on the real nature of the transaction rather than the language which the parties may have employed. Where the transaction is such that the consignee acquires complete dominion over the goods with the right to sell them on such terms and conditions as he may see fit, and is bound to pay the consignor a stipulated price therefor, it amounts to a sale and delivery which passes title to the consignee, and such transfer of title is not affected by the fact that the goods are not to be paid for until resold by the consignee, or that he has an option of returning the goods which he has not resold. Also, where the consignor clothes the consignee with indicia of title and permits him, without objection, to deal with the property as his own, the consignee may transfer title to a purchaser, which will be good as against the consignor."

See, also, Buffum v. Descher, 1 Neb. (Unof.) 736, 96 N. W. 352; Northern Electrical Mfg. Co. v. J. G. Wagner Co., 108 Wis. 584, 84 N. W. 894; Yoder v. Haworth, 57 Neb. 150, 77 N. W. 377, 73 Am. St. Rep. 496; Fulton Motor Truck Co. v. Gordon Fireproof Warehouse & Van Co., 105 Neb. 515, 181 N. W. 162; Mack v. Drummond Tobacco Co., 48 Neb. 397, 67 N. W. 174, 58 Am. St. Rep. 691; Willys-Overland Co. v. Chapman (Tex. Civ. App.) 206 S. W. 978; Eason v. De Long, 38 Tex. Civ. App. 531, 86 S. W. 347.

We are of the opinion that this contract was a contract of sale; and in some respects it partakes of the elements of an absolute sale, but, in any event, it is at least a contract of conditional sale. In 55 C. J. p. 1192, § 1168, a conditional sale is defined as "a contract for the sale of per-

sonal property under which possession is delivered to the buyer, but title is retained in the seller until the performance of some condition, usually the payment of the purchase price."

Here we have a contract which provides for the transfer of the possession of personal property from one party to another, to be paid for at a stipulated price when such property has been sold by the receiver thereof. A 5 per cent. discount is to be allowed if payment is made within 30 days from date of shipment. The receiver is to pay the freight and pay for keeping the goods insured. The receiver might retain the goods for four months without paying interest on his account, but after that time the account would bear interest at 6 per cent. The receiver is to render monthly reports showing the location of unsold pianos, but the shipper seems to be uninterested in resold pianos. The contract in no way attempted to control the manner of selling by the receiver, nor the proceeds of the sale. This contract merely provides for an absolute promise on the part of the receiver to pay a stipulated price for the pianos to the shipper when they are resold. Unsold pianos may be returned if so ordered by the shipper. These provisions are all elements of a contract of sale and are lacking in the elements of bailment for the purpose of sale.

It is suggested in 55 C. J. p. 1193, that the use of the term conditional sale, in connection with a contract such as we have here, is a misnomer and inaccurate and tending to confusion, and that such a transaction is not, strictly speaking, a sale, but an agreement to sell, or an executory contract of sale. And perhaps it would be better here to refer to this contract merely as an executory contract of sale. It was when entered into unquestionably such a contract. It was an agreement to sell to the Walthall Music Company such pianos as might be shipped to it at a fixed price, to be paid for in cash when pianos were resold. If the goods remained with the receiver for more than four months, 6 per cent. interest would be added to the invoice price.

The music company received this piano from appellee under the conditions and covenants contained in the agreement of March 4th. This agreement became an executed contract as to the piano sold to the city of San Antonio when the sale was made, and Walthall Music Company became indebted to appellee for the billing price of the piano.

■■ The question is raised as to whether or not there was a valid sale of this piano to the city. Unquestionably the sale to the city was valid. It is clear from the testimony that there was no understanding as to whether this sale to the city was one for cash or on time. The unconditional delivery of the piano to the city, without the purchase price being paid, was sufficient to pass title to the city and complete the sale. And, this sale having been made, the Walthall Music Company became indebted to appellee for the invoice price of $720, and the appellant, city of San Antonio, became indebted to the music company for the retail price of $1,300. It is plain from the evidence that the music company expected to receive the purchase price in cash from the city when the piano was delivered, and the city intended to pay for the piano in cash, but this apparent understanding of the parties is insufficient to render the delivery of the piano to the city a conditional delivery becoming complete only upon the payment of the purchase price in cash. However, if this sale to the city be regarded as a sale for cash only, the music company waived its right to receive cash on delivery by its failure to reclaim the piano when the payment in cash was refused by the city. 55 C. J. 567, § 576. The music company had authority to sell this piano to whom it pleased, for cash or on time, merely becoming indebted to appellee for the wholesale price of the piano, under the covenant contained in the agreement to pay for the pianos when they were resold. The judgment of the trial court does not hold the sale to the city to be invalid, but, on the contrary, affirms the sale and gives to appellee judgment for the full amount of the retail price, plus interest at 6 per cent.

■ It is perfectly obvious that under no construction of this contract could appellee be entitled to any sum of money in excess of the $720, plus interest, representing the invoice price. The only claim that appellee makes to this difference between the wholesale and the retail price of the piano is that the music company, shortly before becoming a bankrupt, had agreed to pay this sum to it. Appellee has no right as against other creditors to here enforce this promise; and to permit appellee to recover this profit, which belongs unquestionably to the bankrupt estate, would be to permit ap-

pellee to have an unfair preference over other creditors of the bankrupt estate. The city is a preferred and secured creditor of the bankrupt estate.

The construction of this agreement of March 4th being a question of law, and this court being of the opinion that this agreement was one of sale and not of bailment, appellee would have no right to maintain a suit against the city of San Antonio for a debt owing to it by the bankrupt estate of the Walthall Music Company. There would simply be no privity of parties.

It is stated in 55 C. J. p. 1214, under the heading "Effect of authorization to sell," that: "In some jurisdictions, the law is well settled that where goods are sold to a retail merchant for resale in the ordinary course of business, a provision in the contract that title to the goods shall remain in the seller until the goods are paid for, is void as against public policy and the absolute title to the goods passes to the buyer." Unquestionably, this is the rule in this state. Article 5489, R. S. 1925, provides that: "All reservation of the title to or property in chattels, as security for the purchase money thereof, shall be held to be chattel mortgages. * * *" And article 4000, R. S. 1925, provides: "Every mortgage, deed of trust or other form of lien attempted to be given by the owner of any stock of goods, wares or merchandise daily exposed to sale, in parcels, in the regular course of business of such merchandise, and contemplating a continuance of the possession of said goods and control of. said business, by sale of said goods by said owner, shall be deemed fraudulent and void." Unquestionably, if this contract was a reservation of title by the shipper to merchandise daily exposed to sale, it would be void in this state under the provisions of the above articles of our statute. Eason v. De Long, supra.

There is no privity of contract or otherwise between appellee and appellant, and, therefore, the judgment of the court below cannot be upheld. It will be reversed, and judgment here rendered that appellee take nothing by reason of this suit, and pay all court costs.

SMITH, Justice.

I concur in the result reached by Justice MURRAY.

It is my opinion that when the wholesaler delivered possession of the piano in question to the retailer, and empowered the latter, or put the latter into a position, to offer for sale, and sell, the article, along with other merchandise, to the retail trade, the purchaser at such sale, in the absence of fraud or collusion, would take title to the article, without any obligation whatever to the wholesaler, but to the retailer only. Private agreements of this nature between wholesaler and retailer, however binding they may be upon the direct parties thereto, are not binding upon purchasers of merchandise daily exposed to the public for sale in parcels. And in such cases the retail transaction is one between the merchant and customer, in which the customer becomes liable to the former, but in no case to the wholesaler or other creditors of the merchant.

I concur in the conclusions so forcefully expressed by Justice MURRAY.

BICKETT, Chief Justice (dissenting).

I dissent from the majority decision for the reasons hereinafter fully shown.

Chas. M. Stieff, Inc., a corporation, sued the city of San Antonio to recover the price of a piano, which was sold and delivered to the city, or, in the alternative, to recover the possession of the piano and the amount of its reasonable rental value. Plaintiff recovered judgment against defendant for $1,595, representing the purchase price of the piano, $1,300, plus interest. Defendant has appealed from that judgment.

The important issues on this appeal are: (1) Whether, as between Chas. M. Stieff, Inc., and Walthall Music Company, there was a bailment upon consignment or an outright sale of the piano; and (2) whether the city was entitled to retain possession of the piano by reason of a pre-existing tax debt due to the city by Walthall Music Company.

The facts are undisputed and free from doubt.

The contract between Chas. M. Stieff, Inc., and Walthall Music Company, under which the piano was subsequently shipped, was in the form of a letter, dated March 4, 1929, signed by the former and accepted in writing by the latter, reading as follows:

"We will ship in accordance with your order, the following instruments:

#185 Stieff Petit—Figured Mahogany, dull    670.00
# 66 Davis & Son, Mahogany dull    180.00
# 60  Bennett-Bretz, Mahogany    340.00

—on consignment for four months. It is understood that Walthall Music Company is to pay the freight from Baltimore and to carry the insurance at our wholesale prices as above quoted. If the instruments shipped under this agreement are paid for within thirty (30) days from date of shipment, a cash discount of three percent (3%) will be allowed from billing prices.

"Should these instruments not be sold at the expiration of four months, and should we order them returned at that time, or at any future time, Walthall Music Company agrees to pay the freight and for any unreasonable wear and tear.

"Monthly stock reports will be sent Chas. M. Stieff, Inc., showing location of all unsold consigned pianos.

"Should the instruments remain, by mutual consent, above the term of four months it is understood that Walthall Music Company is to pay Chas. M. Stieff, Inc., interest at the rate of six per cent (6%) per annum. In the event the instruments are sold, the firm of Chas. M. Stieff, Inc., will receive from Walthall Music Company cash settlement in full plus the interest charge, if any.

"It is agreed that should Walthall Music Company sell an instrument consigned to them by Chas. M. Stieff, Inc., on time or on installments, Walthall Music Company may as agents of Chas. M. Stieff, Inc., sell to a finance Company such contract resulting from such sale, with recourse on the Walthall Music Company but not on Chas. M. Stieff, Inc., for a sufficient amount to enable the Walthall Music Company to settle with Chas. M. Stieff, Inc., for the instrument involved. Said settlement to be made by Walthall Music Company to Chas. M. Stieff, Inc. immediately after proceeds from sale of such contracts are returned by Walthall Music Company.

"Such additional shipments as may be agreed upon will be made on the same basis and at the then prevailing prices. Your acknowledgment and acceptance of the foregoing will constitute the contract."

Prior to the time the transaction in question arose, there had been a departure from the agreed plan of business, and then a return to the original contractual basis. Between the date of the contract, March 4, 1929, and the time of the bankruptcy of Walthall Music Company, February 3, 1930, Chas. M. Stieff, Inc., shipped to Walthall Music Company about 25 pianos, not including the one involved in this suit. Of those pianos, 5 remained on hand and were delivered by the trustee in bankruptcy of Walthall Music Company to Chas. M. Stieff, Inc., as consignor and owner, and the other 20 had been sold to various purchasers. Walthall Music Company, having accepted purchasers' notes on some of the pianos sold by it prior to the latter part of November, 1929, and having been unable to sell the notes to a finance company, as contemplated, sent to Chas. M. Stieff, Inc., trade acceptances, to which the purchasers' notes were attached as collateral security. In that manner and to that extent the original contract was modified. On November 27, 1929, Chas. M. Stieff, Inc., stated in a letter to Walthall Music Company that it would be necessary for them to revert to the original contract of March 4, 1929, that this should be definitely understood and confirmed by letter from the addressee, and that future shipments would be conditioned upon the receipt of such letter of confirmation. On December 2, 1929, Walthall Music Company confirmed the understanding with reference to the requirement to return to the contract of March 4, 1929, as the basis of all shipments from and after November 27, 1929.

On November 29, 1929, Chas. M. Stieff, Inc., in reply to an inquiry of Walthall Music Company, sent the following telegram: "Can ship five foot eight grand about one week provided you assure us that settlement will be made for cash when sold in accordance with provisons of contract of March fourth. Please wire." On the same day, Walthall Music Company sent a telegram to Chas. M. Stieff, Inc., stating: "Collateral aggregating thirty seven hundred sent you twenty sixth per your letter twenty third. Stop. Sale five foot eight for use Municipal Little Theatre will be cash one. Please ship immediately." Chas. M. Stieff, Inc., accordingly shipped the piano in question to Walthall Music Company on December 13, 1930.

When the piano arrived, it was immediately delivered, on January 15, 1930, by Walthall Music Company to the Municipal Little Theatre, without being placed on exhibit or offered for sale in the store of Walthall Music Company.

It was understood by all parties that the city was to pay the sum of $1,300 in cash for the piano upon its delivery. This was the understanding of Chas. M. Stieff, Inc., and of Walthall Music Company, as shown by the letters and telegrams and the testimony. Such, also, was the understanding and intention of the city, as shown by the official acts of the mayor and commissioners.

On January 13, 1930, two days before the delivery of the piano, in pursuance of the undisputed understanding that the city was to pay cash for the piano, the city commission passed the following ordinance: "Be it ordained by the Commissioners of the City of San Antonio, that the City Purchasing Agent be, and he is hereby, directed to issue requisition to Walthall Music Company for one Stieff Grand Piano for use in San Pedro Playhouse, and that the sum of $1300.00 be and the same is hereby appropriated out of Recreation Fund to pay for same."

Likewise, on the same date, the mayor of the city signed the warrant drawn on the city treasury for $1,300, payable to Walthall Music Company, in payment of the piano.

On January 15, 1930, the city auditor, before delivering the warrant, ascertained that Walthall Music Company was indebted to the city on account of taxes, and, therefore, refused to deliver the warrant until and unless the taxes should be paid. This action of the auditor in refusing to deliver the warrant was taken by reason of a provision in the city charter, which is as follows, to wit: "Section 114. Before the delivery of any warrant by the Auditor to the payee thereof, the Auditor shall carefully ascertain whether or not such person is in any manner indebted to the City for matured taxes or debts of any kind, and if he shall find that such payee is so indebted to the City, he shall not deliver such warrant unless such person shall then and there actually pay such taxes or debts to the proper receiving officer. If such payee refuses to pay such taxes or debts, the Auditor shall refuse delivery of such warrant, and shall make report thereof at the next meeting of the Board of Commissioners, together with a statement of the nature of the claim asserted by the City against the payee, and in such case, the Auditor shall await the action of the Board of Commissioners before delivering such warrant; provided, however, that this section shall apply only to persons receiving warrants for their compensation and shall not apply to current wages of those persons who are to be paid weekly."

So far as the record shows, the auditor did not make any report to the commission as to his refusal to deliver the warrant, nor did the commission take any further action as to the matter.

The city did, however, retain possession of the piano, and has continued to use it without paying for it up to the present time.

Upon the trial of the case, the tax bills of the city of San Antonio and of the San Antonio Independent School District were introduced to show that Walthall Music Company owed taxes to those two municipal corporations.

On February 11, 1930, Chas. M. Stieff, Inc., through its attorneys, informed the mayor that Walthall Music Company had been adjudged bankrupt, that the piano delivered to the city had not been paid for by the city, and that Chas. M. Stieff, Inc., was the owner of the piano, since it had been shipped on consignment to Walthall Music Company. The city refused to surrender the piano, or to pay for it.

Although the city filed its original answer in this case on December 1, 1930, it was not until September 25, 1933, that the city filed its first amended original answer, alleging that it was entitled to retain the piano without paying for it because Walthall Music Company owed the city taxes. This amended answer of the city alleges, in substance, that Walthall Music Company was indebted to the city and the San Antonio Independent School District for a combined total amount of taxes, and vaguely alleges what may be considered as a sort of plea of set-off. At least, the prayer asks for a judgment of set-off and for general and special relief, after having first prayed that plaintiff be denied any recovery. But the answer did not seek the recovery of a money judgment against Walthall Music Company for the taxes.

The tax bills of the San Antonio Independent School District have no conceivable legal relation to the controversy, and, therefore, will not be mentioned further.

The tax bills of the city against Walthall Music Company, as offered in evidence, do not show that they have been credited or canceled to the extent of the price of the piano, but show the entire original amount of taxes claimed by the

city as still due. There was no evidence, either oral or documentary, direct or circumstantial, to show that there had been any application of the pre-existing tax debt of Walthall Music Company to the city upon the claim against the city for the price of the piano. Not only was there no showing whatsoever as to the application of the pre-existing tax debt upon the claim, but, as shown above, there was never any agreement or understanding upon the part of any one connected with the transaction that that should be done.

The determination of the first issue, that is, whether there was a bailment for the purpose of sale or a sale, depends upon the locus of the title to the article.

A statement of certain considerations applicable to the construction of such contracts will facilitate the solution of the question. If the title does not pass to the receiver of the article, viewed from his standpoint, rather than that of the sender, there can be no sale to the receiver. Ludvigh v. American Woolen Co., 231 U. S. 522, 34 S. Ct. 161, 58 L. Ed. 345; Sturm v. Boker, 150 U. S. 312, 14 S. Ct. 99, 37 L. Ed. 1093; Franklin v. Stoughton Wagon Co. (C. C. A.) 168 F. 857; Butler Bros. Shoe Co. v. U. S. Rubber Co. (C. C. A.) 156 F. 1, certiorari denied 212 U. S. 577, 29 S. Ct. 686, 53 L. Ed. 658; In re Columbus Buggy Co. (C. C. A.) 143 F. 859; Milburn Manufacturing Co. v. Peak, 89 Tex. 209, 34 S. W. 102. Thus, there may be a consignment for the purpose of sale to a stranger, but not a sale to the receiver, without in the least degree impairing the true character of the transaction as a bailment. The failure to recognize this is a vice of the majority opinion, as will be shown below. Again, the usual common-law liabilities of a bailee may be added to without changing the transaction from a bailment to a sale. In re Eichengreen (D. C.) 18 F.(2d) 101; Reliance Shoe Co. v. Manly (C. C. A.) 25 F.(2d) 381; In re Galt (C. C. A.) 120 F. 64.' In this matter, some of the indicia of a sale may be present in a bailment. Some such incidental features have, apparently, led to the views expressed in the majority opinion. Finally, if there were any ambiguity in the contract, it should be resolved in favor of the construction that would make it a bailment. In re Smith & Nixon Piano Co. (C. C. A.) 149 F. 111; In re Harris & Bacherig (D. C.) 214 F. 482, by Judge Sanford. This has been ignored by the majority opinion.

The mere enumeration of the salient features of the contract shows the transaction to be an agreement for the shipment of goods upon consignment for the purpose of sale, that is, a bailment. The first sentence is, "We will ship * * * on consignment for four months." The dealer must carry insurance. The manufacturer has the right, at the expiration of four months or at any time thereafter, to order the return to it of any pianos not sold. The dealer must send to the manufacturer monthly stock reports. These stock reports must give the facts, "showing location of all unsold consigned pianos." The condition upon which the dealer was to pay interest was, "should the instruments remain, by mutual consent, above four months." It was "in the event the instruments are sold" that the manufacturer was to receive from the dealer a cash settlement. It was stipulated that, "should Walthall Music Company sell an instrument consigned to them" by the manufacturer on time or on installments, the dealer may, "as agents of Chas. M. Stieff, Inc.," sell "such contract resulting from such sale" with recourse on the dealer, but not on the manufacturer, to a finance company for a sufficient amount to enable the dealer to settle with the manufacturer for the instrument involved.

A dominant purpose throughout the instrument is shown by the use of the words "on consignment," "consigned pianos," and "instruments consigned." The words "consignment" and "consigned" have a definite legal meaning universally understood in the business world, and the common, ordinary, and usual signification should be attached by this court to those words employed in a letter contract between business men. The first use of the phrase "on consignment" was coupled with the additional adverbial phrase "for four months." This specification of time would have been alien to the idea of a sale; it was consistent only with the idea of a bailment. The next verbal repetition, "consigned pianos," is subjoined to the stipulation for the dealer to make monthly stock reports and show the location of "all unsold consigned pianos." Such a requirement, for stock reports on the pianos that had been consigned and that were unsold, coincides perfectly with the same continuous thought of a bailment. And the third employment of some form of the word "consign," "an instrument consigned," is in connection with the handling by the dealer

of an installment sale to a purchaser. The only conceivable reason for the manufacturer making those provisions is that it had for a time intrusted its goods to the dealer, without parting with title, in order that the dealer might attempt to sell them. What more apt words, than the ones employed and reiterated, are there for the expression of the purpose?

To clarity and precision of expression, thus found in the instrument, there is added force by virtue of other provisions. As for particular words, "sell," "sold," and "sale," as applied to the pianos, are used in the letter only in connection with sales to third persons, and not in a single instance with any idea of a sale to the dealer. The thrice repeated specification of a period of time, "four months," within which the dealer might have the opportunity to sell the pianos, has no relation to a sale to the dealer, if that had been intended, but is a necessary provision for a factorage or consignment agreement. The plainly expressed power of the manufacturer to order the return to it of any pianos not sold negatives the theory of a sale to the dealer, but accords with the plan of the bailment. The pointed designation of the dealer as "agents," especially in its context, speaking of the sale by the dealer of "an instrument consigned" and limiting the dealer's authority in indorsement of purchasers' installment notes, is not indicative of a sale, but marks a bailment. Indeed, there is no more distinctive feature of the instrument than the authorization for the dealer to indorse, as the agent of the manufacturer and without recourse, purchasers' installment notes. It shows the intention that such notes should be taken in the name of the manufacturer as payee; otherwise, the notes would not have required an indorsement in the name of the manufacturer for their negotiation. This provision would have been foreign to a sale, but peculiarly applicable to a bailment.

Moreover, the instrument wholly fails to contain any language showing an obligation upon the part of the dealer to purchase a piano. It does not bind or obligate the dealer to pay any purchase price. The dealer does not agree to keep a piano or to pay for it. To receive a piano does not make the dealer liable for a purchase price. To keep a piano for four months imposes no liability. At the expiration of that time, the dealer does not agree to pay for one; it has not then, even, a right to retain possession. The dealer's agreement to pay interest, "should the instruments remain, by mutual consent above the term of four months," imposed as a deterrent to slothfulness, is no promise to pay a purchase price and does not make the pianos the property of the dealer. The undertaking to receive the pianos on consignment for sale to others is no agreement of the dealer to purchase them. And the ultimate obligation to account for the list price out of the proceeds of a sale to another does not make a sale to the dealer; that is the resultant obligation of every bailee under a bailment upon consignment for purpose of sale.

It is, however, by a consideration of the instrument in its entirety, rather than by the close scrutiny of its dissected parts, that it is most clearly and inescapably seen to be a transfer of possession, but not of title, from manufacturer to dealer, so that the latter might have an opportunity to sell to third persons. The principal thought running through the entire instrument is that the manufacturer will place the pianos with the dealer for a limited time, require of the dealer stock reports of those unsold, permit the dealer to sell them for sufficient cash to cover invoice figures or for installment notes payable to the manufacturer, authorize the dealer as its agent to indorse without recourse purchasers' installment notes, and ultimately order the return to it of any unsold pianos. Measured by the only proper criterion, that is, whether title passed from the manufacturer to the dealer, the conclusion is irresistible that it was a bailment and not a sale.

This conclusion is supported by the most respectable authority and has become the basis of a vast amount of our commerce, as will presently be shown by reference to some of the decisions, of which there are many.

One of the most frequently cited cases is In re Columbus Buggy Co., 74 C. C. A. 611, 143 F. 859, 860, in which Judge Sanborn wrote the opinion, and from which the following quotation is taken:

"The material terms of this contract were that the goods should be selected from those of the Columbus company by the Washburn company and should be shipped and billed to it as agent by the Columbus company at the latter's wholesale prices, that the Washburn company might sell the goods at such prices as

it saw fit and that it would pay to the Columbus company the wholesale prices less 5 per cent. discount for the goods it sold in each month by the tenth day of the succeeding month, that it would keep the property insured for the benefit of the Columbus company and would bear all expenses of freight, storage and hauling, that the contract should continue in force one year and that, unless it was renewed, the Washburn company would at its expiration return that portion of the merchandise unsold and the Columbus Company would repay the freight which had been paid upon this portion and that all the goods should be on consignment and the title should remain in the Columbus company and subject to its order until they were sold and paid for in cash. The Columbus company properly presented to the District Court its claim for that part of the merchandise which the Washburn company held unsold under this contract and which the trustee had taken at the time of the adjudication, and that court denied its petition upon the ground that the contract evidenced a conditional sale and was therefore voidable under the statute of Oklahoma. The case is presented to this court by a petition to revise this ruling.

"A conditional sale is one in which the vesting of the title in the purchaser is subject to a condition precedent, or in which its revesting in the seller is subject to a failure of the buyer to comply with a condition subsequent.

"An agreed price, a vendor, a vendee, an agreement of the former to sell for the agreed price and an agreement of the latter to buy for and to pay the agreed price are essential elements of a contract of sale. The contract involved in this case has none of these characteristics. The power to require the restoration of the subject of the agreement is an indelible incident of a contract of bailment. South Australian Ins. Co. v. Randell, L. R. 3 P. C. 101, 108; 2 Kent's Com. *589; Laflin & R. Powder Co. v. Burkhardt, 97 U. S. [110], 116, 24 L. Ed. 973; Sturm v. Boker, 150 U. S. 312, 14 S. Ct. 99, 37 L. Ed. 1093. This contract contains a plain stipulation that the goods are at all times subject to the order of the Columbus company until they are sold and that at the expiration of the term of the contract the Washburn company will return the goods which remain unsold. It was therefore a contract of bailment for sale and it was not subject to the statute of Oklahoma regarding conditional sales. One of the most striking and familiar illustrations of its character is given by Chief Justice Gibson in McCullough v. Porter, 4 Watts & S. (Pa.) 177, 39 Am. Dec. 68, where he says:

" 'Were I to put my horse in the custody of a friend, to be sold for a designated sum, with permission to retain whatever could be got beyond it, it would not be suspected that I had ceased to own him in the meantime, or that my friend would not be bound to return him, even without a stipulation, should he have failed to obtain the prescribed price.'

"A contract between a furnisher of goods and the receiver that the latter may sell them at such prices as he chooses, that he will account and pay for the goods sold at agreed prices, that he will bear the expense of insurance, freight, storage and handling and that he will hold the unsold merchandise subject to the order of the furnisher discloses a bailment for sale and does not evidence a conditional sale. It contains no agreement of the receiver to pay any agreed price for the goods. It is not, therefore, affected by a statute which renders unrecorded contracts for conditional sales voidable by creditors and purchasers. The fact that such a contract provides that the receiver of the goods may fix the selling prices and may retain the difference between the agreed prices of the accounting and the selling prices to recompense him for insurance, storage, commission and expenses does not constitute the contract an agreement of sale. It still lacks the obligation of the receiver to pay a purchase price for the goods and the obligation of the furnisher to transfer the title to him for that price."

A contract similar to the one under consideration was held to constitute a bailment as shown by In re Galt, 120 F. 64, 67, 56 C. C. A. 470, wherein it was said:

"The distinction between bailment and sale is not difficult of ascertainment, if due regard be had to the elements peculiar to each. In bailment the identical thing delivered is to be restored. In a sale there is an agreement, express or implied, to pay money or its equivalent for the thing delivered, and there is no obligation to return. Sturm v. Boker, 150 U. S. 312, 14 S. Ct. 99, 37 L. Ed. 1093; Union Stock Yards & Transit Co. v. Western Land & Cattle Co., 7 C. C. A. 660, 59 F. 49. The bailee may, however, by contract, enlarge his

common-law liability without converting the bailment into a sale. The real intent of the contracting parties must be ascertained from all the provisions in the agreement which express the contract, bearing in mind always that in a bailment the bailor may require the restoration of the thing bailed, and in a sale, whether absolute or conditional, there must be an agreement, express or implied, to pay the purchase price of the thing sold. The test would seem to be—Has the sender the right to compel a return of the thing sent, or has the receiver the option to pay for the thing in money?

"Carefully analyzing the agreement in hand, we think it must be held that the contract of the parties was one of bailment, and not of conditional sale. The Mitchell & Lewis Company thereby appoints Galt its agent for the sale of its manufacture in the limited territory stated, and in no other place or places; agrees to furnish the goods to the agent at 40 per cent. discount from list prices; they to be sold by him, and accounted for to the company in cash or notes of the purchaser drawn upon blanks furnished by the company, running not more than six months, with interest, and made payable to the company; their payment being guarantied by Galt. As an inducement to making sales for cash only, an allowance of 5 per cent. on such sales is allowed by the company. All cash is to be remitted not later than the day following the sale; notes to be transmitted every 30 days. If all sales should be upon time, and the notes returned to the company should aggregate more than the prices of the wagons to be accounted for, the surplus is to be returned to Galt when and in proportion to the amount collected. He agrees to sell all wagons within twelve months from date of shipment, and upon failure so to do, at the option of the company, to (1) pay cash for wagons on hand, at the prices stated; or (2) give his note therefor; or (3) store the wagons subject to the order of the company; the ownership of all wagons furnished to remain in the company until settlement as provided; the money and effects received by Galt in the business of the agency in no case to be appropriated to his private use. Galt agrees to store and keep under cover and in good condition all wagons received; to keep them fully insured at his own expense until sold or ordered away by the company; to pay taxes upon them, if any should be assessed; and he is not to sell or assist in the sale of any other wagons than those manufactured by the company.

"Applying to this contract the test stated, it is clear that here was a bailment, and not a conditional sale. It was not contemplated that Galt should ever own these wagons. He was to sell them to others for the company; his commissions to be the amount which he might receive over the prices stated in the contract. The proceeds, whether in cash or in notes of the purchaser, were to be immediately returned to the company; the notes being guarantied by Galt. This was a del credere commission, and not a sale. The company could compel a return of the goods not sold. Galt had not the option to pay for them in money. Even with respect to the goods unsold within the 12 months, the option for their return or payment was with the company, and not with Galt; and nowhere in the agreement does the latter covenant to pay for these goods as in the case of a sale.

"It is claimed that the agreement is a conditional sale, within the doctrine of Chickering v. Bastress, 130 Ill. [206], 207, 22 N. E. 542, 17 Am. St. Rep. 309, and Peoria Manufacturing Co. v. Lyons, 153 Ill. 427, 38 N. E. 661. But in each of those cases the party receiving the goods gave to the other his notes, evidencing a contract to pay absolutely; the proceeds of the sales to be applied upon the notes. The case is like to that of Lenz v. Harrison, 148 Ill. 598, 36 N. E. 567, where an agreement similar to the one in hand was held to be a bailment, and not a sale."

In Eilers Music House v. Fairbanks, 80 Wash. 379, 141 P. 885, the Supreme Court of Washington held a contract in all essential features precisely like the one here under consideration to be a contract not of sale, but of bailment. It is a coincidence that that case involves, also, the point that the consignee can not dispose of the article (a piano) to a third party for the consideration of a pre-existing debt due by the consignee to the third party. The court after quoting the letter from the retailer to the wholesaler, which constituted the contract, held as follows:

"The whole tenor of the instrument shows that the goods were to be consigned for sale upon commission, and that there was no conditional sale, because the contract does not create the relation of vendor

and vendee. Childs v. Waterloo Wagon Co., 37 App. Div. 242, 57 N. Y. S. 520; National Cordage Co. v. Sims, 44 Neb. 148, 62 N. W. 514.

"In the Sims Case the court, in construing a similar contract, observed that the distinction between conditional sales and consignments of personal property by a principal to a factor for sale upon commission has been frequently overlooked by both text-writers and judges. It quoted approvingly from Newmark on the Law of Sales, § 19, as follows:

" 'Whenever it appears from the contract between the parties that the owner of personal property has transferred the possession thereof to another, reserving to himself the naked title thereof, solely for the purpose of securing payment of the price agreed upon between them, the contract is necessarily a conditional sale and not a bailment.'

"The court further said that the conditional sales statute contemplates only cases in which the relation of vendor and vendee exists; that is, where the title to property involved is intended to pass from one party to the other upon the performance of the condition named. The court further said that a consignment of goods under a contract providing that the consignee shall receive them and return periodically to the consignor the proceeds of sales at prices agreed upon or charged by the latter is not a conditional sale, but a transaction of principal and factor. In the Childs Case, a similar contract was construed as a consignment of goods to a factor to be sold upon commission, and not a conditional sale.

"After the piano in question had been consigned to Goodman and Helgesen, the latter, with the consent of the former, and with the consent of the appellant, withdrew from the business, and the business was continued in the name of Goodman. About two months later Goodman sold the piano to Helgesen, giving him possession, the consideration being a pre-existing debt owed by Goodman to Helgesen and the transfer from Helgesen to Goodman of a conditional sale contract for another piano. Some five months later Helgesen entered into a contract with the respondents whereby he agreed to sell them the piano; they paying $25 in cash, and agreeing to pay the remainder in installments, title being retained by Helgesen.

"It is the settled law that a factor can neither pledge the goods of his principal, nor dispose of them by way of exchange or barter, nor sell them for a prior debt.

" 'Whenever the factor has bartered or disposed of goods in a manner not within the ordinary and accustomed modes of transacting the like business, the principal may follow and reclaim the property; and in such case it is wholly immaterial whether the person dealing with the factor knew him to be such or not.' McCarthy v. Crawford, 238 Ill. 38, 86 N. E. 750, 29 L. R. A. (N. S.) 252, 128 Am. St. Rep. 95.

" 'In the absence of statutes which furnish protection to persons dealing with factors, the principal can recover his property wherever he can trace it as distinct from that of the factor into whomsoever's hands it may have come. He is entitled to recover the specific goods themselves if they can be had, and, if the goods themselves cannot be recovered, he may recover their proceeds if they can be traced. Thus if a factor barters his principal's goods in a manner not authorized by the principal, and not within the ordinary modes of transacting business, the principal may follow and reclaim the property, whether the person dealing with the factor knew him to be such or not. But if the principal has by any act of his own induced a third person to believe he has given the factor authority to dispose of the goods, the principal cannot reclaim them. The principal may recover goods or the proceeds of a consignment of a person to whom they were turned over in the payment of an antecedent debt due from the factor. If goods are wrongfully taken from the possession of a factor by an officer, the owner may recover them back.' 19 Cyc. pp. 174, 175, subd. (e).

"See, also, Childs v. Waterloo Wagon Co., supra; and Warner v. Martin, 11 How. 209, 13 L. Ed. 667.

"This rule applies to a purchaser without notice from one who has acquired possession of property from a factor through barter or exchange, or in consideration of a pre-existing debt. Warner v. Martin, supra. This is true because one who purchases from a factor in consideration of a pre-existing debt, or in part consideration of a pre-existing debt and barter or exchange, acquires no title, and, having no title, can pass none. * * *

"The contract under review is not a contract for a conditional right to purchase, but is a mere consignment of goods by a principal to a factor to be sold upon commission."

From the number of the decided cases, it is apparent that the piano industry in this country, as between wholesaler and retailer, operates to a large extent upon the basis of the decisions holding transactions like the one in this case to be bailments upon consignment for sale to ultimate purchasers, rather than sales to local dealers. These cases, because of their importance in this regard, are separately cited: Eilers Music House v. Fairbanks, 80 Wash. 379, 141 P. 885; Chase-Hackley Piano Co. v. Clymer (Tex. Civ. App.) 202 S. W. 214; Renfro v. Hall (Tex. Civ. App.) 202 S. W. 218; Packard Piano Co. v. Williams, 167 Mo. App. 515, 151 S. W. 211; Norris v. Boston Music Co., 129 Minn. 198, 151 N. W. 971, L. R. A. 1917B, 615; Van Arsdale v. Peacock, 90 Kan. 347, 133 P. 703; Baldwin Piano Co. v. Lyon County State Bank, 126 Kan. 519, 268 P. 859; McKinney v. Grant, 76 Kan. 779, 93 P. 180; Brown v. John Church Co., 55 Ill. App. 615; Bridgeport Organ Co. v. Guldin, 3 Pa. Dist. R. 649; Starr Piano Co. v. Morrison, 159 Mich. 583, 124 N. W. 562; Akin v. Baldwin Piano Co., 62 Okl. 239, 162 P. 221; In re Smith & Nixon Piano Co. (C. C. A.) 149 F. 111.

Other authorities holding similar contracts to create bailments, and not sales, are Dryden v. Michigan State Industries (C. C. A.) 66 F.(2d) 950; Marrinan Medical Supply v. Fort Dodge Serum Co. (C. C. A.) 47 F.(2d) 458; Milburn Mfg. Co. v. Peak, 89 Tex. 209, 34 S. W. 102; Stein Double Cushion Tire Co. v. Wm. T. Fulton Co. (Tex. Civ. App.) 159 S. W. 1013; Whitehouse Bros. v. S. H. Abbott & Son (Tex. Civ. App.) 228 S. W. 599; Overstreet v. Hancock (Tex. Civ. App.) 177 S. W. 217; Barnes v. Darby, 18 Tex. Civ. App. 468, 44 S. W. 1029; Ormsby v. Ratcliff (Tex. Civ. App.) 22 S.W.(2d) 504; Hamilton v. Willing, 73 Tex. 603, 11 S. W. 843; Sturm v. Boker, 150 U. S. 312, 14 S. Ct. 99, 37 L. Ed. 1093; Ludvigh v. American Woolen Co., 231 U. S. 522, 34 S. Ct. 161, 58 L. Ed. 345; In re Harris & Bacherig (D. C.) 214 F. 482, by Judge Sanford; McCallum v. Bray-Robinson Clothing Co. (C. C. A.) 24 F.(2d) 35; Pocahontas Guano Co. v. Smith, 122 Va. 318, 94 S. E. 769; Ward v. Zeigler, 285 Pa. 557, 132 A. 798; National Cordage Co. v. Sims, 44 Neb. 148, 62 N. W. 514.

As to the second issue, if one delivers goods to another as a bailee, upon consignment for the purpose of sale, a third party cannot, as against the bailor, acquire title to the goods for the consideration of a pre-existing debt of the consignee to the third party. The nature of the city's tax claim as a pre-existing debt is free from dispute. It is equally clear that the manufacturer did not agree, expressly or impliedly, for the dealer to part with this piano for anything but cash, which was to be remitted to the manufacturer. The agent (bailee) cannot dispose of the property of his principal (bailor) contrary to the terms of the agreement to a third party who is not a bona fide purchaser for value. And that a pre-existing debt is not a consideration of value such as to support a claim of bona fide purchaser is elementary. The city, therefore, could not have acquired title to the piano for the consideration of its pre-existing tax claim, even if such had been the agreement between the dealer and the city. Eilers Music House v. Fairbanks, 80 Wash. 379, 141 P. 885, and authorities therein cited; Barnes Safe & Lock Co. v. Block Bros. Tobacco Co., 38 W. Va. 158, 18 S. E. 482, 22 L. R. A. 850, 45 Am. St. Rep. 846; B. F. Avery & Sons v. Mansur & Tebbetts Implement Co. (Tex. Civ. App.) 37 S. W. 466, by Judge Fly; Hamilton-Brown Shoe Co. v. Lyons, 6 Tex. Civ. App. 633, 25 S. W. 805; Chattanooga Foundry & Pipe Works v. Gorman, 12 Tex. Civ. App. 75, 34 S. W. 308; Simkins, Equity, 647.

It must also be borne in mind that it was not the intention of the dealer or the city for the tax claim of the city to be applied upon the purchase price of the piano, but that the agreement was that it was a sale for cash to be paid on delivery of the piano to the city. The city even went so far as to pass an appropriation ordinance and to execute a warrant for the purpose of making the cash payment, as contemplated and agreed by every one connected with the transaction. The delivery of the warrant was stopped by the city auditor, because the dealer owed taxes to the city. The piano, meanwhile, was delivered to the Municipal Little Theatre, or San Pedro Playhouse. The city, having thus acquired possession of the piano, asserts the right to keep it without paying for it; as it solemnly promised to do. The city was

not misled, deceived, or defrauded; it received the piano contracted for. The city has paid nothing, given up nothing, suffered nothing. There is no semblance of an estoppel in favor of the city against the manufacturer, the owner of the piano. Thus, there is no possible ground upon which the city can claim the title or right of possession to the piano.

The opinion of the majority in this case rests apparently upon the ideas that the dealer had dominion over the pianos and mingled them with others and sold them at his own price, and that the relation of debtor and creditor arose between the dealer and the manufacturer. The dealer's control of this piano did not make the transaction a sale to him. It must not be overlooked that this piano was ordered specifically for the city, that it was to be paid for in cash by the city, and that the piano was not placed in stock, but was delivered to the city on arrival. But, aside from that, it has been repeatedly held that commingling of consigned goods with others in stock and general sales therefrom at prices fixed by the retailer does not make a sale from wholesaler to retailer out of the transaction. Ludvigh v. American Woolen Mills, 231 U. S. 522, 34 S. Ct. 161, 58 L. Ed. 345; McCallum v. Bray-Robinson Clothing (C. C. A.) 24 F.(2d) 35; Hamilton National Bank v. McCallum (C. C. A.) 58 F.(2d) 912, certiorari denied Scott v. Hamilton Nat. Bank, 287 U. S. 619, 53 S. Ct. 19, 77 L. Ed. 537; In re Klein (C. C. A.) 3 F.(2d) 375; Dryden v. Michigan State Industries (C. C. A.) 66 F.(2d) 950. The only debt obligation created by the contract was that arising after a sale by the dealer to a purchaser, and that obligation, as shown above, is not inconsistent with, but is necessarily incidental to, every bailment of goods for the purpose of sale. The obligation of a bailee is not identical with the obligation of a vendee. The debtor-creditor test, which is sometimes employed in construing an agreement to determine whether it is a sale or a bailment, and which is misunderstood and misapplied by the majority, is an inquiry whether the agreement makes the receiver of the goods an original, absolute promisor. Thus, in Chickering v. Bastress, 130 Ill. 206, 22 N. E. 542, 17 Am. St. Rep. 309, the retailer, to whom the pianos were shipped, executed his promissory notes to the wholesaler for the price of the pianos. But that case was properly distinguished by the same court in Lenz

v. Harrison, 148 Ill. 598, 36 N. E. 567, in which an agreement similar to the one in this case was held to create a bailment, instead of a sale. An examination of those two cases, especially the latter one, shows the error of the majority here in the attempt to apply the debtor-creditor test.

Like the Chickering v. Bastress Case, Buffum v. Descher, 1 Neb. (Unof.) 736, 96 N. W. 352, cited in the majority opinion, is distinguishable, because there was an express agreement to pay for the flour, and because there was no agreement for the return of the flour. The latter case cites the former, a promissory note case, as explained above, showing that the court did not intend to do violence to the settled theories of the law of bailments.

And so Yoder v. Haworth, 57 Neb. 150, 77 N. W. 377, 73 Am. St. Rep. 496, also cited in the majority opinion, involved an unconditional promise of the dealer to pay and, moreover, to give his promissory note. The third paragraph of the contract, set out in that opinion, bound the dealer to execute his note for the amount due; and the ninth paragraph stated: "A final settlement shall be made for all machines and extras ordered, on or before June 1, 1893." That court was not confused in applying the debtor-creditor test, for it cited and differentiated its own true bailment case (like this one), National Cordage Co. v. Sims, 44 Neb. 148, 62 N. W. 514.

Mack v. Drummond Tobacco Co., 48 Neb. 397, 67 N. W. 174, 176, 58 Am. St. Rep. 691, cited in the majority opinion, was another promissory note case. The dealer, on acceptance of the tobacco, was by the very terms of the contract required to execute immediately his promissory notes. And of course the court held that there was a sale; it could not properly have held anything else. In that connection, it is interesting to note that that court did not confuse nor lose sight of elementary principles, for it cited and distinguished (as it subsequently did in the Yoder Case) Cordage Co. v. Sims, supra. The court said: "Not only were Mack & Co. required by the agreement to guaranty the payment of the price of all tobacco shipped them by the tobacco company, but, in addition to that, on the receipt of a bill of goods they were required to execute to the tobacco company their notes for the amount of the goods shipped, due in 60 days. If this did not constitute a sale, it

is difficult to understand what would constitute one. We have not overlooked the case of [National] Cordage Co. v. Sims, 44 Neb. 148, 62 N. W. 514; but the contract construed in that case was very different from the one under consideration here, and the conclusion reached here does not in any manner conflict with the decision in the case last referred to."

Fulton Motor Truck Co. v. Gordon Fireproof Warehouse & Van Co., 105 Neb. 515, 181 N. W. 162, cited in the majority opinion, is, as indicated by the citation therein of Yoder v. Haworth, and Buffum v. Descher, really based on the idea that there was a definite promise of the dealer to pay a sum certain at a date to be marked by the date of sale. The last sentence of the contract read: "I agree to remit to said Fulton Motor Truck Company $3914 on the sale of said trucks." Perhaps too great weight was given to that language in overriding the clear provision that the trucks were the exclusive property of the truck company and were held on consignment. In that respect, the case is probably not the law even in that state, in view of the earlier decisions, and especially in view of the subsequent decision in General Motors Acceptance Corporation v. Hupfer, 113 Neb. 228, 202 N. W. 627.

Northern Electrical Mfg. Co. v. J. G. Wagner Co., 108 Wis. 584, 84 N. W. 894, cited in the majority opinion, is not in point here, because, shortly before, and again a few minutes after, the sale by the dealer, the officer of the electrical company in charge of the matter expressly authorized and approved the particular sale. And of course the electrical company could not thereafter maintain its action against the bona fide purchaser for value, who had bought under the sale made by the dealer and authorized by the manufacturer.

Willys-Overland Co. v. Chapman (Tex. Civ. App.) 206 S. W. 978, cited in the majority opinion, holds that a so-called lease contract was a contract of sale and would have to be registered as a chattel mortgage in order to preserve a lien for unpaid purchase price as against a bona fide purchaser. That contract provided: That the automobile was leased for the sum of $595, $200 cash, and $40 to be paid on the 3d day of each of nine succeeding months, and $35 to be paid on the 3d day of the tenth month, with interest on the deferred payments; and that, in the event the party complied with the terms of the agreement, she should have the right to purchase the automobile for $5. The facts of that case clearly distinguish it from this one.

Eason v. De Long, 38 Tex. Civ. App. 531, 86 S. W. 347, cited in the majority opinion, involved the construction of the following oral agreement: That Smith would sell to De Long a boiler and engine for the price of $300 to be paid in lumber and shingles; that on delivery of the lumber and shingles De Long would own the boiler and engine; and that until then they would remain the property of Smith. The court properly held that that was a sale, and that the attempted reservation of title was in effect a chattel mortgage, and that a bona fide mortgagee from De Long acquired a good lien. The court said: "In this case the sale was on time, with a reservation of title to secure the purchase money. The statute declares such a transaction is a chattel mortgage and void as to creditors or innocent purchasers unless it is in writing and registered." The statement of the case distinguishes it from this one.

Therefore, since there was a bailment of the piano upon consignment for sale and with authority from the bailor to the bailee only to sell it for cash, and since the pre-existing tax claim of the city cannot constitute it a bona fide purchaser for value, Chas. M. Stieff, Inc., was entitled to recover from the city, either the price of the piano, or the possession of the piano and its reasonable rental value. In my opinion, the judgment of the district court should be affirmed.