

# THE ATTORNEY GENERAL
## OF TEXAS

### AUSTIN 11, TEXAS

**WILL WILSON**
**ATTORNEY GENERAL**

July 8, 1960

Honorable Robert S. Calvert
Comptroller of Public Accounts
Capitol Station
Austin, Texas

Opinion No. WW-876

Re: When a "first sale"
of gasoline within
contemplation of the
Motor Fuel Tax Law
occurs under a con-
signment for the pur-
pose of sale.

Dear Mr. Calvert:

You request our opinion as to whether the taxable "first
sale" of motor fuel occurs upon delivery of the fuel into the
storage tanks of a retail dealer or upon withdrawal by him of
the fuel from such storage tanks under terms of a form of
contract submitted with your request.

The kind of transaction under consideration is within the
scope of Articles. 9.01, 9.02 and 9.03 of what is commonly
known as the Motor Fuel Tax Law (Ch. 9, H.B. 11, 56th Leg.,
3rd C.S., 1959, same being Ch. 9 of Title 122A "Taxation-
General" of the Revised Civil Statutes of Texas).

The pertinent portions of the above statutes are:

"'First sale' shall mean, except as
otherwise provided herein, the first sale
or distribution in this State of motor
fuel, produced, refined, compounded, imported
into, or otherwise acquired in said State;
. . . ." Art. 9.01(10).

"'Distribution' shall mean and include
any transaction other than a sale, in which
ownership or title to motor fuel, . . .
passes from one person to another." Art.
9.01(5).

"'Distributor' shall mean and include every
person who refines, distills, manufactures,
produces, or compounds motor fuel or blending
materials in this State,. . . .or in any other
manner acquires or possesses said products,
for the purpose of making a first sale, distri-
bution or use of said products in this State;
. . . ." Art. 9.01(4).

"'Dealer' shall mean and include every person other than a distributor who engages in the business in this State of distributing or selling motor fuel within this State." Art. 9.01(7).

"Art. 9.03 Reports (1) Every distributor who shall be required to collect the tax levied by this Chapter upon the first sale or distribution of motor fuel in this State. . .shall . . .remit. . .the amount of such tax required to be collected. . .and at the same time, such distributor shall make and deliver to the Comptroller. . .a report. . . ."

The contract under consideration in its controlling portions provides that the Distributor (called Seller in the contract) may make deliveries of gasoline into the underground tanks of a retail seller (called Dealer in the contract),

". . .at such time, day or night, as may be convenient for Seller, and shall have full rights of ingress to and egress from said place of business and unrestricted access to Dealer's tanks for the purpose of making such deliveries and for the purpose of gauging tanks, reading pump meters and inspecting all equipment used in connection with the storage and dispensing of gasoline. Dealer hereby authorizes Seller to do any and all things necessary and proper to preserve its gasoline, including, without limitation, locking the fill-pipe caps leading to the tanks and retaining custody of all keys thereto. Seller authorizes Dealer to withdraw such gasoline from the tanks solely by means of the computer pumps located at Dealer's place of business. Title to such gasoline shall remain vested in Seller until and unless the same shall be purchased by Dealer. Gasoline shall be deemed to be purchased and title thereto shall pass from Seller to Dealer as the gasoline passes through and is recorded on the meters of the computer pumps.

"2. Gasoline delivered and stored by Seller hereunder shall be in the custody but not the possession of Dealer and Dealer shall exercise ordinary care in protecting the same from loss, damage or destruction. Dealer shall immediately

notify Seller of any defective condition
of the pumps, meters, tanks, pipe lines,
locks attached by Seller or any other
condition which may affect the safety of
Seller's gasoline.  Dealer agrees that he
shall withdraw gasoline from the tanks only
by means of the computer pumps and shall
keep locked all computer pumps when neither
he nor any of his employees is present on
the premises.  The quantity of gasoline pur-
chased by Dealer shall be determined from a
reading of the meters on the computer pumps
and all gasoline withdrawn from the tanks
whether by Dealer or third parties shall be
deemed to have been delivered to and pur-
chased by Dealer.  Dealer agrees that he
will not tamper with the meters on such
pumps and will not permit third parties to
do so.  Dealer shall maintain daily a detailed
record of all gasoline purchased by him, such
record to be made available for inspection by
Seller at any time and shall render a full
accounting to Seller at such times and in such
manner as Seller may require for all gasoline
so purchased.  Dealer shall pay Seller on
demand for gasoline purchased at the price
set forth in. . . .

"3. . . .Upon termination of this agreement,
Dealer shall promptly pay Seller for all gaso-
line purchased from Seller for which payment
has not theretofore been made.  In addition,
Dealer may, at the time of such termination,
purchase for cash the gasoline stored by Seller
at Dealer's place of business.  If Dealer does
not purchase such gasoline, Seller shall have
the right, without notice and without recourse
to legal proceedings, to remove said gasoline
from the tanks and Dealer agrees that he will
not interfere with such removal."  (Under-
scoring added)

Other statements in the contract refer to Dealer "as custodian
of gasoline so delivered and stored," to his "custodial liability,"
and to his "anticipated purchases of such gasoline."

We can discern nothing in the contract contrary to the
above provisions, which would alter the legal status of the
Dealer in relation to the gasoline delivered into his tanks,
nor the occurrence upon which the motor fuel tax becomes due.

We are of the opinion that the taxable "First sale" occurs "as the gasoline passes through and is recorded on the meters on the computer pumps"--that is, as the retail dealer withdraws it from the storage tanks for sale to his own customers.

We do not believe that the delivery of the gasoline by the party designated in the contract as Seller into the underground tanks of the retailer, under the terms of this contract, is a "first sale," "sale," "distribution," or "use" of the gasoline under any of the statutes hereinabove mentioned or under the holding of State v. City of El Paso, 135 Tex. 359, 143 S.W.2d 366 (1940).

Prior to withdrawal by the retail dealer through his computer pumps we believe he has custody of the gasoline with the legal status of a bailee. Charles M. Stieff, Inc. v. City of San Antonio, 130 Tex. 594, 111 S.W.2d 1086 (1938).

"Any kind of personal property may be the subject of bailment. . .". 6 Am.Jur. (Rev Ed), Bailments, sec. 62, p. 220.

The applicable law we believe is well stated in the case of Whitehouse Bros. v. S. H. Abbott & Son, 228 S.W. 599 (Civ.App. 1921), wherein at page 601 the Court quoted from a Georgia case:

> "On the other hand, if the effect of the contract is that the property is delivered from the bailor to the bailee with the understanding that the title is to remain in the bailor, and the bailee does not assume initial responsibility to pay the purchase price, it is ordinarily not a conditional sale, but is a consignment although the bailee may have the option of purchasing the goods themselves by paying a stipulated price, or may have a right to sell them to other persons upon accounting to the bailor for a stipulated sum, and though the bailee's compensation in the matter may depend upon such profit as he shall realize on the difference between the price at which the goods are consigned and the price at which they are sold, and though the bailee may be responsible to the bailor for the value of such goods as he may sell on a credit, whether he collects from the purchasers or not."

Both the Whitehouse case, and the case of Sturm v. Boker mentioned in the next following paragraph, are cited with approval by the Supreme Court in the Stieff case (supra).

The distinction applicable to the form of contract under consideration as between a contract of sale or return and a bailment is clearly stated in Sturm v. Boker, 150 U.S. 312 (1893) wherein, at page 329, the Court said:

> "An option to purchase if he (the bailee) liked is essentially different from an option to return a purchase if he should not like. In one case the title will not pass until the option is determined; in the other the property passes at once, subject to the right to rescind and return."

The law seems clear and settled that the exercise by a bailee of his option to purchase goods held by him in that capacity and to make himself the debtor for them does not alter his first holding of the goods as a bailee. See also: 8 C.J.S., Bailments, sec. 3d-e, pp. 233-240, and sec. 42, p. 325; 6 Am. Jur. (Rev Ed), Bailments, sec. 37, pp. 198-200; The Law Governing Sales of Goods, Samuel Williston, Vol. 2, (Rev.Ed., 1948), pp. 306-307.

The party designated in the contract under consideration as Seller, under the provisions of Art. 9.03 of the Motor Fuel Tax Law, is the Distributor and required to collect and remit the motor fuel tax and to make the reports required of a distributor under this Article.

## SUMMARY

Under the contract in question the taxable "First sale" under the Motor Fuel Tax Law (Ch. 9, H.B. 11, 56th Leg., 3d C.S., 1959, same being Ch. 9 of Title 122A "Taxation-General" of the Revised Civil Statutes of Texas) occurs upon withdrawal of the gasoline from the storage tanks and as it passes through and is recorded on the meters on the computer pumps of the retail Dealer.

Yours very truly,

WILL WILSON
Attorney General of Texas

W. E. Allen
Assistant

WEA:cm

APPROVED:

OPINION COMMITTEE:
Gordon C. Cass, Chairman

J. Arthur Sandlin
Tom McFarling
B. H. Timmins, Jr.

REVIEWED FOR THE ATTORNEY GENERAL
By:  Leonard Passmore