UNITED STATES of America, Plaintiff,

v.

MENIER HARDWARE NO. 1, INC., Vincent J. Menier, Allena Village Community Center and Border Distributing Company, Defendants.

Civ. No. 3151.

United States District Court
W. D. Texas,
San Antonio Division.
June 10, 1963.

450

William O. Murray, Jr., Asst. U. S. Dist. Atty., and Bailey Rankin, Dallas, Tex., Atty., Small Business Administration, for plaintiff.

Harry A. Nass, Jr., San Antonio, Tex., for defendant, Allena Village Community Center.

Marvin C. Beck, San Antonio, Tex., for defendant, Border Distributing Co.

GRAVEN, Senior District Judge.

This litigation involves the conflicting claims of the plaintiff and the defendants, Allena Village Community Center and Border Distributing Company, to the proceeds of the sale of merchandise originally in the possession of the defendant, Menier Hardware No. 1, Inc.

The defendant, Menier Hardware No. 1, Inc., is a Texas corporation. For several years prior to March 7, 1961, and continuing up into July, 1962, it was engaged in the retail hardware business in Bexar County, Texas. It was the business lessee of the defendant, Allena Village Community Center, a Texas corporation. The defendant, Border Distributing Company, is a partnership located at Laredo, Texas, which, among other activities, distributes motor bikes imported by it. For convenience in reference, the defendant Menier Hardware No. 1, Inc., will be frequently referred to as Menier, the defendant Allena Village Community Center as Allena, and the Border Distributing Company as Border.

On March 7, 1961, Menier secured a loan of $20,000 from the North Side State Bank of San Antonio, Texas. The loan was made under the provisions of Chapter 14A, Title 15 U.S.C.A., relating to Aid To Small Business. Loans made under the provisions of that Chapter are handled by the Small Business Administration. That Administration is an agency of the United States. The loan note was secured by a chattel mortgage upon certain personal property of Menier.[1] The chattel mortgage did not include the stock of merchandise of Menier. Menier became delinquent in its loan payments. On May 23, 1962, the note and mortgage were transferred by the North Side State Bank to the Small Business Administration and by the latter transferred to the plaintiff.

On August 22, 1962, the plaintiff commenced the present action. In its complaint the plaintiff asked judgment against Menier on the loan note upon which there was a balance due of approximately $15,000. It also asked foreclosure of the chattel mortgage securing the note. It also asked that a writ of attachment issue against the property of Menier. In its Affidavit For Attachment, a representative of the plaintiff alleged that Menier had disposed of its property, in whole or in part, with intent to defraud its creditors. A writ of attachment was issued and on August 31, 1962, the stock of merchandise in the possession of Menier was attached. Included in the merchandise attached were sixteen motor bikes which had been received by Menier from Border.

Either by court order or by agreement of the parties, the attached merchandise was sold. The proceeds thereof are now within the jurisdiction of this Court. The parties are agreed that they have the same relationship to the proceeds as they had in relation thereto prior to the sale. The issues between the parties as framed in the Pretrial Order are as next set forth.[2] The plaintiff claims

---

1. The loan note was also secured by a pledge of shares of capital stock of Menier. That stock is not the subject of controversy.

2. In the Pretrial Order it was stated that one of the issues was whether Allena had waived its lien by a subordination agreement entered into by it at the time of

priority over Allena and Border as to all of the proceeds under the United States priority statute, Section 191, Title 31 U.S. C.A. It also claims priority over Border as an existing creditor and attaching creditor. At the time the merchandise was attached in August, 1962, Menier was indebted to Allena in the sum of $1,200, which was the rent for the months of May, June, and July, 1962. Allena claims priority over the plaintiff in the proceeds to the extent of that rent. It claims priority over the plaintiff by virtue of the landlord's lien given it by a Texas statute. It also claims priority over the plaintiff by virtue of a contract lien for rent contained in the lease. Border claims that the motor bikes seized under the attachment were sent to Menier on consignment and that it was the owner of them. Border asks that the proceeds of the sale of the motor bikes be paid to it. The plaintiff controverts that claim of Border. The defendants Menier Hardware No. 1, Inc., and Vincent J. Menier did not appear in the action.

The conflicting claims of the plaintiff and Allena will be first considered. Section 191, Title 31 U.S.C.A., provides:

"Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed."

Section 191 is frequently cited in opinions as Section 3466 R.S. It is de-

rived from Section 5 of the Act of March 3, 1797, c. 20, 1 Stat. 515, and has been in force as enacted without significant modification. See United States v. Saidman (C.A.D.C.1956), 231 F.2d 503, 505. Section 3466 does not create a lien; it establishes a priority in favor of the United States in the distribution of the property of an insolvent debtor. United States v. O'Dell (6th Cir. 1947), 160 F.2d 304, 306. The United States Supreme Court in cases having to do with liens which are in competition with claims asserted by the United States under the priority statute has applied certain rules. Those rules are similar to those applied by it in cases having to do with liens which are in competition with claims asserted by the United States under the federal tax lien statute. That statute is Section 6321, Title 26 U.S.C.A.

In more recent decades there have been a multitude of cases dealing with the question of the priority of federal tax liens over competing non-federal liens. Non-federal liens have fared badly in that competition. See cases listed in Mason City and Clear Lake R. Co. v. Imperial Seed Co. (D.C.1957), 152 F.Supp. 145, 153, 154. The competing non-federal liens have generally lost out because of the application of the so-called "specific and perfected lien" tests applied by the United States Supreme Court. See Kennedy, The Relative Priority Of The Federal Government: The Pernicious Career Of The Inchoate and General Lien, 63 Yale Law Journal 905 (1954).[3] See, also, the report of study in book form of Plumb & Wright on federal tax liens under sponsorship of the American Law Institute and American Bar Association (July, 1961). See, also, cases cited in Wolverine Insurance Company v. Phillips (D.C. 1958), 165 F.Supp. 335, 345, and Beeghly v. Wilson (D.C.1957), 152 F.Supp. 726, 734. In the present case, as heretofore noted, the plaintiff as against Allena asserts priority under the priority statute.

making the loan. At the trial the plaintiff expressly abandoned its claim of waiver.

3. For citations of other law review writings, see Wolverine Insurance Company v. Phillips (D.C.1958), 165 F.Supp. 335, 345, 346, and Randall v. Colby (D.C. 1961), 190 F.Supp. 319, 337, 339.

Allena, in the first instance, asserts priority over the plaintiff by virtue of its statutory landlord's lien.

▮▮▮▮ Article 5238, Vernon's Civil Statutes of Texas, provides, in part:

"All persons leasing or renting any residence, storehouse or other building, shall have a preference lien upon all property of the tenant * * * for the payment of rents due and to become due * * *."

The rent owing from Menier to Allena at the time the levy was made under the plaintiff's attachment was for the months of May, June, and July, 1962. Allena did not at any time prior to the levy of the attachment take possession of any of the Menier merchandise or take any other steps to enforce its statutory lien. Allena cites the cases of In re Cardwell (D.C. Texas 1931), 52 F.2d 158; In re Allen (D.C.Texas 1950), 92 F.Supp. 717; and Shwiff v. City of Dallas (Tex.Civ.App. 1959), 327 S.W.2d 598, as bearing upon its statutory lien. In the case of In re Cardwell, supra, the Court stated (52 F.2d p. 159):

"Article 5238, Revised Statutes of Texas, gives a landlord a preference lien upon the property of the tenant for the payment of rents due and to become due. This lien is fixed by the statutes and is independent of any levy or compulsory proceedings, Marsalis v. Pitman, 68 Tex. 624, 5 S.W. 404; Livingston v. Wright, 68 Tex. 706, 5 S.W. 407, * * *."

In the case of In re Allen, supra, the Court stated (92 F.Supp. p. 721):

" * * * Article 5238 * * * gives landlords a preference lien, as distinguished from the laws of some of the other States which give landlords only a right to fix or acquire such a lien. * * *"

In the case of Shwiff v. City of Dallas, supra, the Court stated (327 S.W.2d p. 601):

"Art. 5238, V.A.C.S., gives to a landlord a lien on property of the tenant located in a leased building. All other claimants of interest in the tenant's property are held to have constructive notice of this statutory lien in behalf of the landlord. Lehman v. Stone, 4 Willson Civ.Cas.Ct. App. § 121, 16 S.W. 784; Stoma v. Filgo, Tex.Civ.App., 26 S.W.2d 1100; 27 Tex.Jur. 170. * * *"

In the present case there is first presented the situation of a state statutory lien being in competition with a claim of the United States based upon the priority statute. That same situation was presented to the United States Supreme Court in the case of United States v. Waddill, Holland & Flinn, Inc. (1945), 323 U.S. 353, 65 S.Ct. 304, 89 L.Ed. 294, where the contest was between a claim of the United States based on the priority statute and a Virginia statutory landlord's lien in the distribution of the property of a debtor who had made an assignment for the benefit of creditors. The Court upheld the priority claim of the United States. The Court stated (p. 355 of 323 U.S. p. 306 of 65 S.Ct.):

"The words of § 3466 are broad and sweeping and, on their face, admit of no exception to the priority of claims of the United States. * * * But this Court in the past has recognized that certain exceptions could be read into this statute. The question has not been expressly decided, however, as to whether the priority of the United States might be defeated by a specific and perfected lien upon the property at the time of the insolvency * * *."

The landlord asserted that it came under the claimed exception. The Court stated (p. 355 of 323 U.S. p. 305 of 65 S. Ct.) that it was not necessary for it to decide the question as to whether a specific and perfected lien would prevail over a claim of the United States based on the priority statute for the reason that the claim of the landlord was not sufficiently specific and perfected on the date of the debtor's assignment for the benefit of creditors to present that question. The Court further stated (p. 356 of 323 U.S. p. 306 of 65 S.Ct.):

"The landlord rests its claim upon certain provisions of the Virginia Code of 1936. Sections 5519 and

5523 authorize a landlord to levy distress for six months' rent upon 'any goods of the lessee * * * found on the premises, or which may have been removed therefrom not more than thirty days * * * for not more than six months' rent if the premises are in a city or town.' * *

"The Supreme Court of Appeals of Virginia has here held that these sections 'give the landlord a lien which is fixed and specific, and not one which is merely inchoate, and that such a lien exists independent of the right of distress or attachment, which are merely remedies for enforcing it.' * * * It has also held that such a lien 'relates back to the beginning of the tenancy,' * * *. These interpretations of the Virginia statutes, as propositions of state law, are binding. But it is a matter of federal law as to whether a lien created by state statute is sufficiently specific and perfected to raise questions as to the applicability of the priority given the claims of the United States by an act of Congress. If the priority of the United States is ever to be displaced by a local statutory lien, federal courts must be free to examine the lien's actual legal effect upon the parties. A state court's characterization of a lien as specific and perfected, however conclusive as a matter of state law, cannot operate by itself to impair or supersede a long-standing Congressional declaration of priority. * * *"

The Court in referring to the landlord's lien, further stated (p. 357, 323 U.S. p. 306 of 65 S.Ct.):

"* * * As of the date of the voluntary assignment, it was neither specific nor perfected. It gave the landlord only a general power over unspecified property rather than an actual interest in a definitive portion or portions thereof."
The Court further stated (p. 358, 323 U.S. p. 307 of 65 S.Ct.):

"Nor was the statutory lien perfected as a matter of actual fact, regardless of how complete it may have been as a matter of state law. The tenant was divested of neither title nor possession by the silent existence of the landlord's statutory lien on the date of the assignment. * * *"

The provisions of the Virginia landlord's lien statute involved in the Waddill case differ somewhat from the provisions of the Texas landlord's lien statute. However, in the Waddill case the United States Supreme Court accepted the interpretation of the Supreme Court of Appeals of Virginia that the Virginia statute gave the landlord a lien independent of the right of distress or attachment. The Texas cases heretofore cited gave a similar interpretation to the Texas statute.

Subsequent to the decision of the United States Supreme Court in the case of United States v. Waddill, Holland & Flinn, Inc., supra, the Texas Civil Court of Appeals, Austin, rendered its decision in the case of United States v. Scott & Gregg Real Estate Co. (1950), 229 S.W. 2d 888. In that case a tenant became insolvent and was placed in a state court receivership. At the time the receivership was instituted, the tenant was indebted to the United States. He was also indebted to his landlord for rent. The United States asserted priority under the priority statute. The landlord claimed priority by virtue of the lien for rent given it by the Texas landlord's lien statute. The Court, in passing upon the question of priority, referred to and discussed the priority statute, the Texas landlord's lien statute and a number of the decisions of the United States Supreme Court, including the decision of that Court in the Waddill case. The Court then stated (229 S.W. 2d p. 890):

"In view of the statutes above noted and of the cases cited here, we do not believe that the landlord's statutory lien was either specific or perfected on June 7, 1949, * * *."

454

The Court held that the United States was entitled to priority in payment over the landlord.

It seems clear that it has been authoritatively determined that the lien of Allena under the Texas landlord's lien statute does not meet the required tests of specificity and perfection and, therefore, is subordinate to the claim of the United States.

■■ There is a feature that is to be considered in connection with the claim of the United States under the priority statute. Where the United States is seeking to enforce a federal tax lien, the solvency or insolvency of the debtor is not legally relevant. United States v. Hoper (7th Cir.1957), 242 F.2d 468, 469. However, insolvency on the part of the debtor is necessary in order to bring the priority statute into operation. In the case of United States v. New Britain (1954), 347 U.S. 81, p. 85, 74 S.Ct. 367, p. 370, 98 L. Ed. 520, the Court stated:

> "When the debtor is insolvent, Congress has expressly given priority to the payment of indebtedness owing the United States, whether secured by liens or otherwise, by § 3466 of the Revised Statutes, 31 U.S. C. (1946 ed.) § 191. * * *"

However, it seems clear that insolvency on the part of the debtor is alone not sufficient to bring the priority statute into operation. It was heretofore noted that the priority of the United States is in the distribution of the debtor's property. Therefore, in order to bring the priority statute into operation, the property of the debtor must be subject to distribution other than by the debtor himself.

■ The situation of the debtor Menier in the present case is somewhat different from what it is in most cases where the United States makes a claim under the priority statute. Menier has not made an assignment for the benefit of creditors and it is not in receivership. It is not in bankruptcy. The Bankruptcy Act contains its own priorities, and the priority statute (Section 191, Title 31, U.S.C.A.) is not relevant in the case of bankruptcy. In the present case the parties concede and the record conclusively shows that Menier was insolvent at the time of the levy of the attachment.

The priority statute is not specific as to the matter as to when the property of an insolvent is to be considered available for distribution within the purview of the statute. In the case of Massachusetts v. United States (1948), 333 U.S. 611, 68 S.Ct. 747, 92 L.Ed. 968, the following appears in the majority opinion: [4]

> " * * * The federal priority under § 3466 attaches from the time the insolvent debtor transfers or loses control over his property. * * *"

In the present case Menier lost control over the property here involved and it became subject to court distribution by the levy of the attachment.

■ It is the holding of this Court that the priority statute became operative as to the property here involved when it was levied upon under the writ of attachment.

It is the further holding of this Court that under the priority statute the claim of the United States has priority over Allena's statutory landlord's lien.

■ Allena claims by way of alternative that if it did not have priority over the plaintiff by virtue of its statutory lien for rent it had priority over the plaintiff by virtue of a contractual lien for rent contained in its lease. In connection with the making of the original loan, Menier and Allena on March 10, 1961, executed a written lease for the business premises. The lease was for a term of five years from October 1, 1961. It contained the following provision:

> "Lessor shall have a lien as security for the rental as above provided · upon all the goods, wares, chattels, fixtures, furniture and other personal property which are or may be put on the leased premises."

Allena did not at any time prior to the levy of attachment take possession of any

4. Footnote 8, p. 617 of 333 U.S., p. 751 of 68 S.Ct.:

of the property of Menier or take any steps to enforce its contract lien. The question is whether Allena is in a better situation in the matter of priority over the plaintiff with its lien than it is with its statutory lien.

In 1958 the United States Supreme Court rendered its decision in the case of United States v. R. F. Ball Construction Co., Inc., 355 U.S. 587, 78 S.Ct. 442, 2 L. Ed.2d 150. That case arose in this District. That case involved a contest as to the percentage retained in connection with a San Antonio housing project subcontract. In connection with the execution of a performance bond the subcontractor made an assignment to the surety of any retained percentages. That assignment was made to secure the surety company against any losses which it might sustain by reason of its being a surety on the performance bonds of the subcontractor. The United States then filed tax liens against the subcontractor. Subsequently the surety sustained a loss under another performance bond of the subcontractor. It made claim to the retained percentage under its assignment. The United States claimed that its tax liens filed subsequent to the assignment prevailed over the assignment because the latter was not sufficiently choate. The District Court was of the view that the surety company's assignment came more nearly within the classification of a mortgage under the Texas law than any other classification. It held that the surety company had the status of a "mortgagee" within the purview of Section 6323, Title 26 U.S.C.A., and, therefore, was entitled to priority over the federal tax liens subsequently filed. Section 6323, in substance, protects those having the status of "mortgagees, pledgees, purchasers, and judgment creditors" against subsequent federal tax liens.

On appeal the decision of the District Court was affirmed by the United States Court of Appeals for the Fifth Circuit on the opinion of the District Court, 239 F. 2d 384. The United States Supreme Court granted certiorari. That Court, with four Justices dissenting, rendered the following decision:

"The judgment is reversed. The instrument involved being inchoate and unperfected, the provisions of [the predecessor of Section 6323(a)] § 3672(a), Revenue Act of 1939, 53 Stat. 449, as amended, 53 Stat. 882, 56 Stat. 957, [26 U.S.C.A., Section 3672(a)], do not apply. See United States v. Security Trust & Savings Bank, 340 U.S. 47 [71 S.Ct. 111, 95 L.Ed. 53]; United States v. City of New Britain, 347 U.S. 81, 86–87 [74 S.Ct. 367, 370–371, 98 L.Ed. 520]. \* \* \*"

In this connection it seems desirable to make a short résumé of some of the developments in the field of law relating to claims of the United States under the priority statute [Section 3466] and under the federal tax lien statute [Section 6321] prior to the decision in the Ball case. Prior to 1929 it was seemingly the well-settled view of the United States Supreme Court that the priority given the United States under Section 3466 did not effect antecedent liens. However, in 1929 in the case of County of Spokane v. United States, 279 U.S. 80, 49 S.Ct. 321, 76 L. Ed. 621, that Court held that a lien for county taxes against the personal property of an insolvent debtor for whom a receiver had been appointed was subordinate to a claim of the United States under the priority statute because the lien of the county was not "perfected" or "completed" at the time the debtor went into receivership. In 1941 the same Court held that a claim of the United States under the priority statute was prior to the lien of the State of Texas for gasoline taxes. United States v. Texas, 314 U.S. 480, 62 S.Ct. 350, 86 L.Ed. 356. The Court held that the state's lien was lacking in specificity and perfection when the claim of the United States arose. The property subject to the state's lien was said not to be "specific" or "constant" and the amount of the lien was "unliquidated and uncertain." Furthermore, the state's lien was said to be "inchoate and general" because judicial process was still required

to enforce the lien when the federal claim attached since the lien "did not of its own force divest the taxpayer of either title or possession."

In 1945 the United States Supreme Court decided the Waddill case, heretofore discussed, in which it was held, as heretofore noted, that the United States had priority under the priority statute over a statutory landlord's lien in the distribution of the property of an insolvent. In 1946 the United States Supreme Court decided the case of Illinois ex rel. Gordon v. Campbell, 329 U.S. 362, 67 S.Ct. 340, 91 L.Ed. 348. In that case the State of Illinois had filed a lien of record for unemployment contributions. The State sued to enforce its lien and upon its request a receiver was appointed for the insolvent taxpayer. The United States asserted a claim against the insolvent taxpayer under the priority statute. The United States Supreme Court affirmed the holding of the Illinois Supreme Court that the state's claim was subordinate to the claim of the United States. The state's lien in that case identified the lienor. The amount of the lien was certain but the property subject to the lien was indefinite. The United States Supreme Court stated (p. 376 of 329 U.S. p. of 67 S.Ct.) that specificity and perfection required title and possession in the lienor and noted that the appointment of a receiver was merely a step in the perfection of the lien. The Court was of the view that the recording of the lien did not perfect it.

Commencing in 1950 with the case of United States v. Security Trust & Savings Bank, 340 U.S. 47, 71 S.Ct. 111, 95 L.Ed. 53, the United States Supreme Court for the first time applied the specific and perfected tests to non-federal statutory liens in competition with federal tax liens. It has continued to do so. Thus, beginning in 1950 the United States Supreme Court applied to non-federal liens which competed with claims of the United States based on the federal tax lien statute the same specific and perfected tests that it had applied since 1929 to non-federal liens which competed with claims of the United States based on the

priority statute. United States v. Toys Of The World Club, Inc. (2d Cir.1961), 288 F.2d 89, 92, 93.

In the Ball case the United States Supreme Court for the first time subordinated a prior contractual lien to a subsequently filed tax lien. Doubt has arisen as to the scope and extent of the holding in that case. In a Note, 43 Minnesota Law Review 755 (1959), the writer states (p. 768):

"* * * there appear to be at least three possible interpretations of the Ball decision; that is, the Company was not entitled to the protection of notice-filing [Section 6323] as a 'mortgagee' because (1) it was not a 'mortgagee' in the usual, commercial sense; or (2) even though a 'mortgagee' in the commercial sense, it was not a 'mortgagee' for tax purposes, either (a) because the interest created by the lien failed to meet the tests imposed by the 'general and unperfected lien' doctrine, or (b) because the Company's lien failed to satisfy commercial standards of perfection."

In this connection it is to be noted that it is not clear whether the "specific and perfected" doctrine involves separable tests. See Note, Minnesota Law Review, supra, footnote 7, pp. 756, 757. Specificity requires that the lienor be identified, the amount of the lien must be certain, and the property subject to the lien must be definite. Perfection is said to require that the lienor divest the debtor of title and possession. It is further to be noted that while a "mortgagee" is given protection against subsequent tax liens by Section 6323, no similar protection is afforded to non-federal liens where the United States asserts a claim under the priority statute.

The matter of the interpretation of the holding in the Ball case has been the subject of discussion in legal publications. See Note, 27 Fordham Law Review 284 (1958); Comment, 33 St. John's Law Review 157 (1958); Note, 10 Alabama Law Review 462 (1958); Heron, Federal Tax Claims Again, or Devastation Revisited, 26 Insurance Counsel Journal 112

(1959); Plumb, Tax Collection and Lien Problems (two-part article 1958), 13 Tax Law Review 247, 507. The Ball case is discussed on pp. 475, 476. Final Report of the Committee on Federal Liens, American Bar Association (Feb. 23, 1959). The Ball case is discussed on pp. 14, 15.[5] In the case of Hoare v. United States (9th Cir. 1961), 294 F.2d 823, the Court stated (p. 828):

> "* * * The encumbrance involved in Ball was not in form a mortgage, and what the Supreme Court said in its per curiam opinion may have been intended to indicate the view that the claimant was not a mortgagee within the meaning of the statute [Section 6323]."

In the case of United States v. Bond (4th Cir. 1960), 279 F.2d 837, certiorari denied (1960), 364 U.S. 895, 81 S.Ct. 220, 5 L.Ed.2d 189, there was involved the question as to whether taxes paid by the Perpetual Building Association, a mortgagee of real estate, subsequent to the filing of a federal tax lien had priority over such lien. By a divided court it was held that the federal tax lien had priority. In the majority opinion it is stated (p. 845 of 279 F.2d):

> "Perpetual urges that the opinion of the majority in the Ball Construction Co. case could be supported only by a finding that the assignment was not a mortgage; and if the majority had determined that the protected interests mentioned in § 3672(a) [Section 6323 U.S.C.A.] should be subject to the choate lien tests, there would certainly have been a full opinion announcing a decision of such moment. Perpetual's argument is unacceptable to us. The per curiam opinion in Ball Construction Co. clearly states the reason upon which the decision is based, namely, that the instrument is inchoate and unperfected. Both of the cases cited by

the majority, Security Trust and New Britain, set forth the choate lien test, a further indication of the basis of the court's opinion. Here again * * * we venture to suggest a conflict between the majority and the minority as to the interpretation of 'choate lien'. However, we do not perceive any real conflict of opinion as to the applicable rule of law."

The uncertainty in the matter of the proper interpretation to be placed on the decision in the Ball case is illustrated by the Crest Finance Company case. In the case of United States v. Crest Finance Co. (1961), 291 F.2d 1, the United States Court of Appeals for the Seventh Circuit held that under the doctrine of the Ball case an assignment of accounts receivable to the Crest Finance Company was subordinate to subsequent federal tax liens because the assignment was not choate and perfected at the time the federal tax liens attached. Crest Finance Company filed a petition for a writ of certiorari. The action of the United States Supreme Court in connection with the opinion appears in the case of Crest Finance Co., Inc. v. United States (1961), 368 U.S. 347, 82 S.Ct. 384, 7 L.Ed.2d 342, in which the following per curiam opinion was filed:

> "In the light of the Solicitor General's concession that petitioner's lien is choate, and the Court agreeing therewith, certiorari is granted, the judgment is vacated and the case is remanded to the Court of Appeals for further proceedings not inconsistent with this opinion."

On remand, United States v. Crest Finance Company (1962), 302 F.2d 568, the 7th Circuit Court of Appeals stated (p. 569):

> "When this case was here before, the United States leaned heavily upon the decision in United States v.

---

5. The writer of this opinion heretofore discussed the decision in the Ball case to some extent. Wolverine Insurance Company v. Phillips (D.C.1958), 165 F. Supp. 335, 349, 350; Randall v. Colby (D.C.1961), 190 F.Supp. 319, 338–340; Community School District of Eldora v. Employers Mut. Cas. Co. (D.C.1961), 194 F.Supp. 733, 743.

R. F. Ball Construction Company, 355 U.S. 587, 78 S.Ct. 442, 2 L.Ed.2d 510. This decision was called to our attention at five different places in the Government's brief. We thought the decision was controlling but the United States, changing its emphatically expressed views, convinced the Supreme Court it was not controlling, so we must adopt that view."

It appears that at the present time the decision in the Ball case affords somewhat slippery footing for the lower federal courts in cases having to do with nonfederal contractual liens which are in competition with claims of the United States. In the Crest Finance Company case there was involved the question of whether the assignment there under consideration was within the protection of Section 6323 providing for protection of mortgagees against subsequent tax liens. In the present case Section 6323 is not involved. There is involved a conflict between a claim of the United States based on the priority statute and a nonfederal contractual lien. It may develop that the tests for the competing lien are the same in both situations.

This Court is of the view that it would be desirable to compare the situation of Allena in this case and the characteristics of its lien with the situation of lienors and the characteristics of their liens in cases in which liens involved were subordinated to the claims of the United States.

■ Under the Texas law the contractual lien of Allena, similar to the contractual lien of the bonding company in the Ball case, had the status of a chattel mortgage. Shwiff v. City of Dallas (Tex.Civ.App.1959), 327 S.W.2d 598, 602. In the case of United States v. Scott & Gregg Real Estate Co. (Tex.Civ.App. 1950), 229 S.W.2d 888, it was held, as heretofore noted, that under the doctrine of the Waddill case the claim of the landlord for rent based on the Texas landlord's lien statute was subordinate to a claim of the United States based on the priority statute. In that case the landlord had not taken title or possession of the property of the insolvent debtor prior to the time the claim of the United States arose. The situation is the same in the present case. The statutory landlord's lien involved in the Waddill case had the same characteristics as the contractual lien of Allena involved in this case. The contractual lien of Allena in the present case had characteristics somewhat similar to the statutory liens subordinated to the claims of the United States under the priority statute in the cases of County of Spokane v. United States, supra, and United States v. Texas, supra. It is to be noted that in the case of United States v. Scovil (1955), 348 U.S. 218, 75 S.Ct. 244, 99 L.Ed. 271, a statutory landlord's lien which had characteristics similar to Allena's contractual landlord's lien was held to be subordinate to federal tax liens.

It would seem that where two landlords are similarly situated as to the property involved and their liens have the same lien characteristics that their priority status in relation to claims of the United States asserted under the priority statute should not turn on the fact that one landlord's lien had its origin in contract and the other had its origin in a statute.

In the present case Allena, in support of its claim for priority for its three months' rent, asserts priority for that claim under a contractual lien which has all of the characteristics of its statutory lien. Its situation in connection with its relation to the property involved, so far as enforcement was concerned, was the same in the case of its contractual lien as it was in the case of its statutory lien. It is the view of this Court that the situation of Allena as to priority over the claim of the United States based on its contractual lien for rent is no better than it was on its claim for the same rent based upon the Texas landlord's lien statute.

It is the holding of this Court that the claim of the United States is prior and superior to the claim of Allena based on its contractual lien.

At the present time there are numerous unsettled, troublesome, questions in the field of law relating to the status of contractual liens generally in relation to claims of the United States. The holding of this Court just stated on the question of priority is limited to the type of contractual landlord's lien here asserted.

There is still to be considered the conflicting claims of the United States and Border to the motor bikes in the possession of Menier at the time of the levy of the attachment. In the present case, as heretofore noted, the chattel mortgage of the plaintiff did not include the stock of merchandise in the possession of Menier, so as to that property the plaintiff prior to the levy of the attachment had the status of an unsecured and pre-existing creditor. After the levy of the attachment it had the status of an attaching creditor. Under Rule 64 of the Federal Rules of Civil Procedure, the remedy of attachment is made available to the parties to federal district court actions in the manner provided by the law of the state in which the district court is held. In the present action the plaintiff made use of the provisions of the Texas statutes relating to attachment. Allena in its brief and argument does not make any contention as to the proceeds of the sale of the motor bikes.

The first question is whether Border was the owner of the motor bikes here involved. Vincent J. Menier, the President of Menier, and Charles Jackman, of Border, testified orally as to the arrangements between Menier and Border in relation to those bikes. The situation as to those bikes as between them will be next stated. Border would ship motor bikes to Menier to be sold by the latter. The sale price of the motor bikes as between Border and Menier was specified. Menier was free to sell the motor bikes to its customers at prices fixed by it and under terms fixed by it. Upon the sale of motor bikes to a customer Menier was to pay Border the sale price specified as between them. A customer to whom a motor bike was sold could not obtain a title registration certificate to it under the Texas title registration act without a manufacturer's certificate. The manufacturer's certificates were retained by Border until Border reported a sale, at which time Border would complete the certificate and send it to Menier for delivery to the purchaser. The books and records of Menier did not show any indebtedness owing to it for motor bikes shipped to it. Its records treated the motor bikes shipped to it as being received on consignment. No registration nor recordation was ever made of the arrangements between Menier and Border as to the motor bikes. The motor bikes were placed on the sales floor of Menier along with other merchandise without any tag or mark indicating that they had been received on consignment. Each of the motor bikes carried a motor number and a serial number. When motor bikes were shipped Border would send an invoice relating to the shipment. The invoices used by Border in that connection were printed forms used by it generally. In those forms the printed words "Sold To" appeared near the top of the invoice. At the bottom of the invoice appeared the following printed words: "Our responsibility ceases when goods are delivered to carrier and we are not responsible for loss or damage in transit. Return of merchandise will not be accepted without seller's authority."

In its brief and argument the plaintiff asserts that the various invoices introduced into evidence represented the entire agreement between Menier and Border in relation to the motor bikes. Based on that assumption, the plaintiff further asserts that the testimony of Vincent J. Menier and Charles Jackman to the effect that the agreement between Menier and Border provided for the shipment of the motor bikes on consignment was inadmissible under the parol evidence rule. In that connection the plaintiff argues that the printed words "Sold To" appearing near the top of the invoices were not subject to being contradicted by parol evidence. It is a very serious question as to whether the plaintiff, by proper objections at the trial,

preserved the question of the admissibility of such testimony under the parol evidence rule. However, apart from that matter, the plaintiff is a stranger to the contract between Menier and Border. It is well settled that one who is a stranger to a contract may not invoke the parol evidence rule in relation thereto. 32 C.J.S. Evidence § 861; Jarvis v. Matson (Tex.Civ.App.1908), 113 S.W. 326, 328; Johnson Farm Equipment Company v. Cook (8th Cir. 1956), 230 F.2d 119, 125. Therefore, Menier and Border were entitled, as against the plaintiff, to establish by parol evidence the actual nature of the agreement between them as to motor bikes. That parol evidence was to the effect that those motor bikes were shipped to them on "consignment." The word "consignment," as heretofore noted, appeared in a number of invoices.

In the case of Charles M. Stieff, Inc. v. City of San Antonio (Commission of Appeals Texas 1938), 130 Tex. 594, 111 S.W.2d 1086, the Court stated (pp. 1090, 1091):

"* * * The words 'consignment' and 'consigned' have a definite legal meaning universally understood in the business world, and the common, ordinary, and usual signification should be attached by this court to those words employed in a letter contract between business men. * * *"

In the case of West v. Hartford Fire Insurance Company (1957), 248 Iowa 993, 83 N.W.2d 465, the Court stated (p. 468 N.W.2d):

"It has been said that in a sense all goods shipped to another are consigned to him, but in the mercantile sense 'consigned' implies agency and carries an implication that the title to the property is not in the consignee. 15 C.J.S. Consign page 988. Also see 35 C.J.S. Factors § 1, page 390; Cooper v. American Fruit Growers, 137 Cal.App. 494, 30 P.2d 558, and citations; Northern Electrical Mfg. Co. v. J. C. Wagner Co., 108 Wis. 584, 84 N.W. 894."

The case of In re Prager (D.C.1958), 173 F.Supp. 859, involved a contract between a trustee in bankruptcy of an insolvent merchant and a company which had shipped merchandise to the merchant prior to the bankruptcy. The merchandise had been shipped to the merchant on a "consignment" basis. The Court held in favor of the consignor. It stated (p. 861 of 173 F.Supp.):

"A consignment of goods for sale is a bailment and does not imply a sale, but imports an agency with title in the consignor. 12 C.J. 528; 15 C.J.S. Consignment. * * * 'The vital, distinguishing feature of a conditional sale is that the purchaser undertakes an absolute obligation to pay for the goods; while a consignment is nothing more than a bailment for sale.' In re Sachs, D.C.Md. 1927, 21 F.2d 984, 986."

The case of In re Lexington Appliance Company (D.C.1962), 202 F.Supp. 869, involved a review of a decision by a Bankruptcy Referee holding that the title to certain merchandise was in the consignor. The decision of the Referee was affirmed. In the invoices for the merchandise appeared the designations, "Trust Receipt" or "Net 10 days." The Court stated (p. 871 of 202 F.Supp.):

"A consignment is generally defined as a bailment for care or sale, where there is no obligation to purchase on the part of the consignee. The presence or lack of an obligation to purchase or pay for the goods on the part of the consignee is the most important factor in determining whether the agreement may be termed a consignment, because, if the alleged consignee is absolutely bound in all events to pay for the goods unsold, even though title is reserved in the alleged consignor, the transaction is a sale, or at least a conditional sale. These characteristics of a consignment appear from the following authorities: * * * 4 Collier, Bankruptcy, § 70.18(5). Collier collects numerous authorities on the point. * * *"

The Court goes on to state on the same page:

"* * * Manifestly, the Referee was correct, on this record, in attaching no basic significance to the designations 'Trust Receipt' or 'Net 10 days' on the invoices."

In connection with its argument that Menier was not a bailee of the motor bikes, the plaintiff stresses the following printed words appearing at the bottom of the invoices, to wit: "Our responsibility ceases when goods are delivered to carrier and we are not responsible for loss or damage in transit. * * *."

Charles Jackman, of Border, testified that that provision related to the matter of who was to assume responsibility for the loss of the consigned goods while in transit as between it and Menier. The plaintiff argues, in substance, that such an obligation is one not assumed ordinarily by a bailee. Under common-law it was doubtless true that a bailee would not ordinarily be responsible for the loss of the bailed goods in transit from the bailor. However, it is quite competent for a bailee to contract to enlarge his common-law liability without converting the bailment into a sale. Charles M. Stieff, Inc. v. City of San Antonio, supra; In re Flanders (7th Cir. 1905), 134 F. 560. In the first case cited the Court stated (p. 1090 of 111 S.W.2d):

"* * * Again, the usual common-law liabilities of a bailee may be added to without changing the transaction from a bailment to a sale. In re Eichengreen, D.C., 18 F.2d 101; Reliance Shoe Co. v. Manly, 4 Cir., 25 F.2d 381; In re Galt, 7 Cir., 120 F. 64. * * *"

The plaintiff also calls attention to the printed words, "Return of merchandise will not be accepted without seller's authority," and the printed words, "Sold To," appearing on the invoices. It claims that those words negative the existence of a bailor-bailee relationship. It was heretofore noted that in making invoices for the consigned goods Border made use of a printed form generally used by it in connection with outright sales. The case of Sturm v. Boker (1893), 150 U.S. 312, 14 S.Ct. 99, 37 L.Ed. 1093, involved the question of the status of certain goods shipped by Boker to Sturm. In connection with the transaction Boker used a printed bill-head in which appeared the words, "Bought of [Boker] * * *." The Court held that the contract between the parties was not a contract for the sale of the goods by Boker to Sturm but was a bailment under the terms of the correspondence. The Court stated (p. 326 of 150 U.S. p. 103 of 14 S.Ct.):

"* * * The words 'consign' and 'consigned' employed in the letters were used in their commercial sense, which meant that the property was committed or entrusted to Sturm for care or sale, and did not by any express or fair implication mean the sale by the one or purchase by the other. * * *"

In referring to the word "Bought" appearing in the printed bill-head, the Court stated (pp. 326, 327 of 150 U.S. p. 103 of 14 S.Ct.):

"* * * A printed bill-head can have little or no influence in changing the clear and explicit language of the letters, and it in no way controls, modifies, or alters the terms of the contract. The purpose and object of the bill was to give a description and valuation of the articles to which the contract as embraced in the letters had reference, * * *."

In the case of Charles M. Stieff, Inc. v. City of San Antonio, supra, the Court stated (p. 1090 of 111 S.W.2d):

"* * * Finally, if there were any ambiguity in the contract, it should be resolved in favor of the construction that would make it a bailment. In re Smith & Nixon Piano Co., 8 Cir., 149 F. 111; In re Harris & Bacherig, D.C., 214 F. 482, by Judge Sanford. * * *" See, also, Garrett v. International Milling Co. (Tex.Civ.App.1949), 223 S.W.2d 67.

▌ In the present case in the arguments of the parties there was some discussion of the possible pertinency of the Texas Certificate of Title Act relating to motor vehicles. Article 1436–1, Vernon's Penal Code. It was heretofore noted that Border retained the manufacturer's certificate as to the motor bikes. The plaintiff contends, and correctly so, that the Texas Title Registration Act would not have prevented the passing of title to the motor bikes to Menier if Border and Menier had agreed that title was to pass. Motor Inv. Co. v. Knox City (Texas Supreme Court 1943), 141 Tex. 530, 174 S.W.2d 482. In that case the Court, in discussing the Texas Certificate of Title Act, stated (p. 485 of 174 S.W.2d):

" * * * The term 'owner,' as defined in Section 4, excludes manufacturers and dealers * * *."

The Court brought out that presentment of a manufacturer's certificate properly filled out was necessary only for the purpose of enabling the purchaser of a motor vehicle from a dealer to register the motor vehicle and secure a certificate of title. It is to be noted, however, that Border, by retaining the manufacturer's certificate, could exercise control over the disposition of the motor bikes.

▌ It is well settled that the Texas law is determinative on the question of the nature of the agreement between Menier and Allena. The leading Texas case bearing on that question is the case of Charles M. Stieff, Inc. v. City of San Antonio (Commission of Appeals of Texas, 1938), 111 S.W.2d 1086, which has been heretofore cited. The plaintiff and Border discussed that case at considerable length in their briefs and arguments. In that case the Commission on Appeals reviewed the decision of the Court of Appeals, San Antonio, in the same case. In the Court of Appeals the case appeared sub nom as City of San Antonio v. Chas. M. Stieff, Inc. (1935), 83 S.W.2d 357. The facts in that case will first be considered. Charles M. Stieff, Inc., a Maryland corporation, was a wholesaler of pianos. Walthall Music Company, a Texas Corporation, was a retail dealer in music instruments in San Antonio. For convenience, the wholesaler will be frequently referred to as Stieff and the retailer as Walthall. Arrangements were made between Stieff and Walthall relating to the handling of pianos wholesaled by Stieff. The agreement between them was contained in a letter. That letter, as set forth in the Court of Appeals opinion, 83 S.W.2d 357, 358, is as follows:

" '(Letterhead of Walthall Music Company.)
" 'San Antonio, Texas, March 4, 1929.
" 'Walthall Music Company, San Antonio, Texas
" 'Dear Sirs: We will ship in accordance with your order, the following instruments:
[description of three pianos]
—on consignment for four months. It is understood that Walthall Music Company is to pay the freight from Baltimore and to carry the insurance at our wholesale prices as above quoted. If the instruments shipped under this agreement are paid for within thirty (30) days from date of shipment, a cash discount of three per cent (3%) will be allowed from billing prices.
" 'Should these instruments not be sold at the expiration of four months, and should we order them returned at that time, or at any future time, Walthall Music Company agrees to pay the freight and for any unreasonable wear and tear.
" 'Monthly stock reports will be sent Chas. M. Stieff, Inc. showing location of all unsold consigned pianos.
" 'Should the instruments remain, by mutual consent, above the term of four months it is understood that Walthall Music Company is to pay Chas. M. Stieff, Inc. interest at the rate of six per cent (6%) per annum. In the event the instruments are sold, the firm of Chas. M. Stieff, Inc. will receive from Walthall Music Company cash settlement in full plus the interest charge, if any.

" 'It is agreed that should Walthall Music Company sell an instrument consigned to them by Chas. M. Stieff, Inc. on time or on installments, Walthall Music Company may as agents of Chas. M. Stieff, Inc., sell to a finance Company such contract resulting from such sale, with recourse on the Walthall Music Company but not on Chas. M. Stieff, Inc., for a sufficient amount to enable the Walthall Music Company to settle with Chas. M. Stieff, Inc., for the instrument involved. Said settlement to be made by Walthall Music Company to Chas. M. Stieff, Inc. immediately after proceeds from sale of such contracts are returned by Walthall Music Company.

" 'Such additional shipments as may be agreed upon will be made on the same basis and at the then prevailing prices. Your acknowledgment and acceptance of the foregoing will constitute the contract.

" 'Very truly yours,
" 'Chas. M. Stieff, Inc.,
" 'Per [Signed] Frederick
Phillip Stieff, Vice Pres.
" 'Accepted and agreed to
" 'Walthall Music Co.
" 'By: Leon N. Walthall.' "

Under this agreement a number of pianos were shipped by Stieff to Walthall. Walthall fixed its own sales prices and the terms of the sales. Walthall sold a number of the pianos to its customers. It made settlement for them by executing its trade acceptances to Stieff and attaching thereto as collateral the notes and sale contracts of the various customers. That practice continued until Walthall was indebted to Stieff in excess of $8,000.

In 1929 the City of San Antonio selected for its Municipal Little Theatre a piano of the type displayed at Walthall's place of business. Walthall requested shipment to it of a piano of the make and stye selected by the City. The piano was shipped to Walthall and by it delivered to the City. The piano was never mingled with the other merchandise of Walthall nor displayed by it at its place of business. After delivery of the piano, but before payment was made for it, the City discovered that Walthall was indebted to it for past due taxes. The City sought to hold those taxes out of the purchase price. Walthall subsequently became bankrupt. Stieff brought an action against the City for the purchase price. In the trial court judgment was rendered in favor of Stieff. On appeal to the Court of Appeals that judgment was reversed by a divided court. The Commission of Appeals of Texas reversed the decision of the Court of Appeals.

In the Commission of Appeals opinion there was extended discussion of many decisions bearing upon the matter of consignments for sale. The Court in its opinion referred to the letter heretofore set out. It stated in relation thereto (p. 1091 of 111 S.W.2d) :

" * * * the instrument wholly fails to contain any language showing an obligation upon the part of the dealer to purchase a piano. It does not bind or obligate the dealer to pay any purchase price. The dealer does not agree to keep a piano or to pay for it. To receive a piano does not make the dealer liable for a purchase price. To keep a piano for four months imposes no liability. At the expiration of that time, the dealer does not agree to pay for one; it has not then, even, a right to retain possession. The dealer's agreement to pay interest, 'should the instruments remain, by mutual consent above the term of four months,' imposed as a deterrent to slothfulness, is no promise to pay a purchase price and does not make the pianos the property of the dealer. The undertaking to receive the pianos on consignment for sale to others is no agreement of the dealer to purchase them. And the ultimate obligation to account for the list price out of the proceeds of a sale to another does not make a sale to the dealer; that is the resultant obligation of every bailee under a bailment upon consignment for purpose of sale."

The Court held that the agreement of the parties in relation to the piano was one of consignment for sale and not one of sale. The agreement in that case and the actions of the parties in relation to the pianos presented a stronger case in support of the sale theory than do the agreement and actions of the parties in the present case.

Under the record in the present case and under the applicable Texas law, it satisfactorily appears that the motor bikes in question were shipped by Menier for consignment and sale.

This Court finds and holds that prior to and at the time of the attachment as between Menier and Border the motor bikes in question were not the property of Menier and that the latter merely held them as a bailee for the former. However, in addition to its contention that the agreement between Menier and Border was not one of consignment and sale the plaintiff contends that nevertheless its claim to the proceeds of the motor bikes is superior to the claim of Border. That contention will be next considered.

The more recent decisions of the United States Supreme Court relating to tax liens have enunciated what is commonly referred to as the "no property" rule. United States v. Bess (1958), 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135; Aquilino v. United States (1960), 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365; and United States v. Durham Lumber Co. (1960), 363 U.S. 522, 80 S.Ct. 1282, 4 L.Ed.2d 1371. It is the rationale of those decisions that in a case involving a tax lien which is in competition with other claims in relation to certain property or property rights the relation of the delinquent taxpayer to the property or property rights under local state law is first ascertained. If it is ascertained that the delinquent taxpayer is the owner of the property involved, or has property

rights on it, then the federal law is looked to for the purpose of determining the question of priority as between the tax lien and the competing claim or claims as to the property or property rights involved. Logan Planing Mill Co. v. Fidelity and Casualty Co. of N. Y. (D.C.1962), 212 F.Supp. 906, 919. In the present case if the United States had been asserting a federal tax lien against Menier such lien would not attach to the motor bikes in question for they were not the property of Menier. The priority statute provides for priority of the United States in the distribution of the property of an insolvent debtor. It does not purport to give the United States priority in the distribution of the property of one not indebted to it. In the present case the motor bikes involved were at all times the property of Border. Under neither of the federal statutes referred to would the United States have any claim to them. However, it is the contention of the United States that even if it be determined that the motor bikes were at all times the property of Border as between Menier and Border, nevertheless, under the law of Texas, its claim to the proceeds of the motor bikes is superior to the claim of Border. Apart from situations involving the priority statute and the federal tax lien statute, there are situations in which the status of the United States as a creditor under local state law gives it rights as against other persons as to certain property which are greater than the debtor had. For examples of this, see Mason City and Clear Lake R. Co. v. Imperial Seed Co. (D.C. 1957), 152 F.Supp. 145, 157, 158; [6] Noltze Motor Comany v. Burrows-Moore Pontiac (D.C.1958), 157 F.Supp. 593. The case of Edmundson v. Scofield (D.C. Texas 1950), 92 F.Supp. 91, is of interest in this connection. In that case the plaintiff was the assignee of a chattel mortgage on the property of the Texas Die

6. In that case federal liens prevailed over an unrecorded contractual lien. In the present case the lease containing Allena's contractual lien was not recorded. However, the plaintiff herein does not contend that it had the status of a cred-

itor without notice as to Allena's liens. Under the Texas law the plaintiff was charged with notice of Allena's statutory landlord's lien. The lease between Menier and Allena which contained the contractual lien was an integral part of the orig-

Casting Corporation. The chattel mortgage had been recorded but the assignment of it to the plaintiff was not. An unauthorized release of the mortgage by Bruhl was subsequently recorded. Thereafter the Collector of Internal Revenue seized the property covered by the chattel mortgage in connection with the enforcement of a tax lien against the mortgagor. The plaintiff sought to enjoin the tax lien enforcement proceedings. The Collector relied on the provisions of Article 5490, Texas Revenue Code Statutes, which provides, in part, as follows:

"Every chattel mortgage, deed of trust, or other instrument of writing, intended to operate as a mortgage, or lien upon personal property, and every transfer thereof which shall not be accompanied by an immediate delivery and be followed by an actual and continued change of possession of the property mortgaged, pledged, or affected by such instrument, shall be absolutely void as against the creditors of the mortgagor or person making same, as against subsequent purchasers and mortgagees or lien holders in good faith, unless such instrument, or a true copy thereof, shall be forthwith deposited with and filed in the office of the County Clerk * * *."

The Court stated (p. 95 of 92 F.Supp.):

"The 'creditors' referred to in the statute are creditors who have acquired some character of lien upon the property, as distinguished from general creditors, see the many annotations to Art. 5490, Vol. 16, p. 212, Vernon's Ann.Civ.Stat. The United States acquired such lien when it followed the statutory procedure provided therefor. * * *"

The Court further stated on the same page:

" * * * His [the plaintiff's] unrecorded assignment is *absolutely*

void against a lien creditor, as is the Government here. * * *"

The application of the plaintiff to enjoin the tax lien enforcement proceedings was denied.

In the present case the plaintiff, under the Texas law, by the levy of the writ of attachment became a lien creditor of Menier as to its stock of merchandise. Prior to the levy the plaintiff, under the Texas law, had the status of a pre-existing general creditor. The plaintiff claims priority as to the motor bikes in question both as a lien creditor and as a pre-existing general creditor. The plaintiff was not a so-called "reliance" creditor, since the loan upon which its claim is based was made prior to the shipment of the motor bikes in question. The record is barren of any evidence that any Border motor bikes were in the possession of Menier at the time the loan was made.

It is the claim of the plaintiff that under the common-law [7] and under certain Texas statutes the consignments for sale of the motor bikes here involved were void as to it. In that connection the plaintiff relies upon, among other Texas statutes, Article 4000 and Article 5489, V.A.T.S. Article 5489 provides, in part, as follows:

"All reservation of the title to or property in chattels, as security for the purchase money thereof, shall be held to be chattel mortgages, and shall, when possession is delivered to the vendee, be void as to creditors and bona fide purchasers, unless such reservations be in writing and registered as required of chattel mortgages. Nothing in this law shall be construed to contravene the landlord and tenant law. * * *"

Article 4000 provides:

"Every mortgage, deed of trust, or other form of lien attempted to be given by the owner of any stock of goods, wares or merchandise daily exposed to sale, in parcels, in the

---

inal loan documents and the plaintiff was chargeable with knowledge of its provisions.

7. Texas has never adopted the Uniform Sales Act.

regular course of business of such merchandise, and contemplating a continuance of the possession of said goods by said owner, shall be deemed fraudulent and void; * * *."

When the Stieff case came before the Civil Court of Appeals, the majority of the Court were of the view that under the two statutes and under the Texas common-law the agreement was void as to the City of San Antonio. The decision of the majority was based upon the assumption that the agreement relating to the pianos provided for a sale to the retailer with a reservation of title by the wholesaler by way of security. The Commission of Appeals repudiated that view and assumption.

The plaintiff argues that the holding of the Commission of Appeals in the Stieff case is not determinative in the present case, for in that case the particular piano involved was never mingled with the other merchandise of the retailers nor displayed for sale by them. The particular piano came into the possession of the retailer but was soon thereafter delivered to the City of San Antonio.

■■■ The Commission of Appeals in its opinion would seem to have answered that argument. It stated (p. 1096, 111 S.W.2d):

"The opinion of the majority in [the Court of Appeals] * * * rests apparently upon the ideas that the dealer had dominion over the pianos and mingled them with others and sold them at his own price, and that the relation of debtor and creditor arose between the dealer and the manufacturer. The dealer's control of this piano did not make the transaction a sale to him. It must not be overlooked that this piano was ordered specifically for the city, that it was to be paid for in cash by the city, and that the piano was not placed in stock, but was delivered to the city on arrival. But, aside from that, it has been repeatedly held that commingling of consigned goods with others in stock and general sales

therefrom at prices fixed by the retailer does not make a sale from wholesaler to retailer out of the transaction. Ludvigh v. American Woolen Co., 231 U.S. 522, 34 S.Ct. 161, 58 L.Ed. 345; McCallum v. Bray-Robinson Clothing, 6 Cir., 24 F.2d 35; Hamilton National Bank v. McCallum, 6 Cir., 58 F.2d 912, certiorari denied Scott v. Hamilton Nat. Bank, 287 U.S. 619, 53 S.Ct. 19, 77 L.Ed. 537; In re Klein, 2 Cir., 3 F.2d 375; Dryden v. Michigan State Industries, 8 Cir., 66 F.2d 950. * * *"

The plaintiff apparently further contends that the agreement between Menier and Border was void as to it because it was not recorded. It has been heretofore found and determined that the agreement between Menier and Border provided for a bailment of the motor bikes. In 8 C.J.S. Bailments § 18, the rule is stated as follows:

"In the absence of statute, a bailment contract need not be registered or recorded. * * *

"In the absence of statute, registration or recordation of a contract of bailment is not necessary to its validity, either as between the bailor and the bailee or as against third persons. Under some statutes, however, registration or recordation is necessary to render the contract valid as against purchasers and creditors. * * *"

See, also, 2 Merrill on Notice, Section 946, p. 510. The pertinent Texas recording statute, Article 5489, provides for the recording of instruments in which there are reservations of title by way of security. It does not purport to provide for the recording of contracts of bailment. It is well recognized that permitting a manufacturer or wholesaler to reclaim merchandise from the stock of merchandise of an insolvent retailer is fraught with serious possibilities. It is fraught with the possibility that such manufacturer or wholesaler may, after insolvency develops, make it appear that certain merchandise had been shipped on con-

signment when such was not the case. The situation is especially fraught with serious possibilities where the alleged consigned merchandise is mingled with the other merchandise of the retailer without its bailment status being indicated. In such situations credit may be extended in reliance upon the apparent ownership of that merchandise by the retailer. That feature is not present in the instant case.

In a few states the problems connected with consignment merchandise have been sought to be met by statutes which specifically require the recording of consignment or other bailment agreements.

The Uniform Commercial Code, Section 2-326(3), provides another approach to the problems. It provides, in part, as follows:

> "Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the persons conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as 'on consignment' or 'on memorandum'. \* \* \*."

The plaintiff cites that Section in support of its contention. That Code has been adopted by eighteen states. It has not been adopted by Texas. The plaintiff argues that, although the Uniform Commercial Code has not been adopted by Texas, the Section set out represents both the general law and the Texas law on the subject. However, as heretofore noted, the Commission of Appeals of Texas in the Stieff case stated (p. 1096 of 111 S.W.2d) that the fact that the "commingling of consigned goods with others in stock and general sales therefrom \* \* \* does not make a sale from wholesaler to retailer out of the transaction."

In the oral arguments in the present case there was considerable discussion as to the possible effect or impact on the Texas law relating to consignments by the Uniform Trust Receipts Act adopted by Texas in 1959. Article 5499a-51, Vernon's Texas Statutes. There are cases in which there is presented the question as to whether the arrangements in regard to certain merchandise received by a retailer has the status of consigned property or the status of "trust receipt" property. That question was presented in the case of General Motors Acceptance Corporation v. Bettes (Tex.Civ.App. 1933), 57 S.W.2d 263. That case was decided prior to the adoption by Texas of the Uniform Trust Receipts Act. In that case it was held that the lien of a landlord for rent had priority as to automobiles in the possession of a dealer as against an automobile finance company claiming under an unrecorded agreement between that company and the dealer. The Court held that the automobiles had the status of "trust receipt" property rather than consigned property in that the finance company retained title by way of security. The Court further held that the agreement was void as to the landlord because of its non-recordation. Apart from other distinguishing features, it seems clear that one of the features which distinguishes consigned property from trust receipt property is that in the case of trust receipt property there is a retention of title by way of security. Section 15 of the Texas Uniform Trust Receipts Act provides that it shall not apply to "transactions of bailment or consignment in which the title of the bailor or consignor is not retained to secure an indebtedness to him of the bailee or consignee." See, also, In re Lexington Appliance Company (D.C.1960), 185 F. Supp. 235, where the Court, in referring to the Uniform Trust Receipts Act, stated (p. 237): "The Act was not designed to cover consignments \* \* \*."

In the present case the title to the motor bikes involved was not retained by Border to secure indebtedness owing by Menier to it. The transaction was a consignment transaction which was not within the purview of the Texas Uniform Trust Receipts Act.

 It is the holding of this Court that the claim of Border to the proceeds of the sale of the motor bikes here involved is prior and superior to the claim of the plaintiff.

It was heretofore noted that Allena in its briefs and arguments did not assert priority over Border as to those proceeds. However, its situation as to those proceeds was not determinatively different from the situation of the plaintiff. It, like the plaintiff, was not a reliance creditor. The lease between it and Menier was executed prior to the time the motor bikes in question were shipped to Menier. While its liens on the property owned by Menier arose earlier than did the attachment lien of the plaintiff, neither of its liens would attach to property not owned by Menier.

It Is Hereby Ordered that Judgment shall be entered (1), adjudging the claim of the defendant, Border Distributing Company, in and to the proceeds of the sale of the sixteen motor bikes here involved is prior to the claim of the plaintiff and the defendant, Allena Village Community Center; (2), adjudging that the claim of the plaintiff in and to the proceeds of the sale of all of the other property involved is prior to the claim of the defendant, Allena Village Community Center.

It Is Further Ordered that the foregoing shall constitute the findings of fact, conclusions of law, and order for judgment in this case. Rule 52(a) of the Federal Rules of Civil Procedure.[8]

---

8. Later. On the same day that this Court entered the foregoing memorandum herein the United States Supreme Court handed down its decision in the case of United States v. Pioneer American Insurance Company, 83 S.Ct. 1651. It held that recordation of federal tax liens prior to the entry of judicial decree that determined the amount of attorney's fee allowable to the mortgagee prosecuting a real estate foreclosure suit that had been instituted before liens' recordation entitled the tax liens to priority over mortgagee's claim for attorney's fee since the claim for attorney's fee remained inchoate until decree. The Court cited and discussed the Ball case.